# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF OKLAHOMA

ALFRED BRIAN MITCHELL,　　　　)
　　　　　　　　　　　　　　　　)
　　　　　Petitioner,　　　　　　)
　　　　　　　　　　　　　　　　)
vs.　　　　　　　　　　　　　　)　　Case No. CIV-11-429-F
　　　　　　　　　　　　　　　　)
KEVIN DUCKWORTH,[1] Interim　　)
　　　　Warden,　Oklahoma State　)
　　　　Penitentiary,　　　　　　)
　　　　　　　　　　　　　　　　)
　　　　Respondent.　　　　　　　)

## MEMORANDUM OPINION

Petitioner, a state court prisoner, has filed a petition for writ of habeas corpus seeking relief pursuant to 28 U.S.C. § 2254 (Doc. 21). This is Petitioner's second habeas challenge to the convictions and sentences he received in Oklahoma County District Court Case No. CF-91-206.

In 1992, Petitioner was tried by jury and found guilty of the crimes of first degree murder, robbery with a dangerous weapon, larceny of an automobile, first degree rape, and forcible anal sodomy. Finding three aggravating circumstances (especially heinous, atrocious, or cruel; committed for the purpose of avoiding or preventing a lawful arrest or prosecution; and the existence of a probability that Petitioner would commit criminal acts of violence that would constitute a continuing threat to society), the jury sentenced Petitioner to death for the murder. On the

---

[1] Pursuant to Fed. R. Civ. P. 25(d), Kevin Duckworth, who currently serves as interim warden of the Oklahoma State Penitentiary, is hereby substituted as the proper party respondent in this case.

remaining counts, Petitioner received an aggregate imprisonment sentence of 170 years. In 1997, after an unsuccessful pursuit for relief in the state courts,[2] Petitioner initiated his first habeas corpus action. In 1999, the Court granted Petitioner partial relief. Finding that Petitioner's rape and sodomy convictions violated his right to due process, the Court conditionally granted the writ, giving the State the option to retry Petitioner on these charges. The Court denied all other requested relief. Mitchell v. Ward, 150 F. Supp. 2d 1194 (W.D. Okla. 1999). On appeal, Petitioner asserted, among other claims, that the unconstitutional rape and sodomy convictions required a new capital sentencing proceeding as well. The Tenth Circuit agreed. Mitchell v. Gibson, 262 F.3d 1036 (10th Cir. 2001).

Since the Tenth Circuit's decision in 2001, Petitioner has had two state court resentencing proceedings.[3] In both of these subsequent proceedings, Petitioner was sentenced to death.[4] The resentencing ordered as a result of Petitioner's first habeas action was held in 2002; however, in Mitchell v. State, 136 P.3d 671 (Okla. Crim. App. 2006), the OCCA found multiple errors and ordered a second resentencing. The second resentencing was held in 2007, and the OCCA found no errors in this proceeding which warranted relief. Mitchell v. State, 235 P.3d 640 (Okla. Crim. App. 2010). In Mitchell v. State, No. PCD-2008-356 (Okla. Crim. App. July 7, 2010) (unpublished), the OCCA also denied Petitioner post-conviction relief.

_____

[2] Mitchell v. State, 934 P.2d 346 (Okla. Crim. App. 1997) (first post-conviction application); Mitchell v. State, 884 P.2d 1186 (Okla. Crim. App. 1994) (first direct appeal).

[3] The State did not retry Petitioner on the rape and sodomy charges.

[4] In both of the resentencing proceedings, the jury rejected the continuing threat aggravator, and in the second resentencing, the jury also rejected the avoid arrest aggravator. Thus, the only aggravating circumstance supporting Petitioner's death sentence is the jury's finding in the second resentencing that the murder was especially heinous, atrocious, or cruel (O.R. VII, 1375).

In his petition, Petitioner has presented twenty-one grounds for relief. Doc. 21. Respondent has responded to the petition and Petitioner has replied. Docs. 30 and 38. In addition to his petition, Petitioner has filed motions for discovery and an evidentiary hearing. Docs. 22, 23, 39, and 40. After a thorough review of the state court record (which Respondent has provided), the pleadings filed herein, and the applicable law, the Court finds that, for the reasons set forth below, Petitioner is not entitled to his requested relief.

## I. Facts.

In adjudicating Petitioner's appeal of his second resentencing, the OCCA incorporated the facts from its 1994 opinion and reproduced its summary of the facts from its 2006 opinion. In so doing, the OCCA noted that "[t]he evidence presented at the second re-sentencing trial was sufficiently the same as that presented at the first re-sentencing so that we may rely on the brief summary of facts set forth in our earlier opinion[.]" Mitchell, 235 P.3d at 646. Since Petitioner does not dispute these facts, they are presumed correct in accordance with 28 U.S.C. § 2254(e)(1) and reproduced here:

> Briefly stated, on January 7, 1991, [Petitioner] found Elaine Scott alone at the Pilot Recreation Center in Oklahoma City. The evidence presented at the resentencing established that [Petitioner] first attacked Scott near the Center's library, where a spot of blood, one of Scott's earrings, and a sign that she had been hanging were later found on the floor. Scott apparently ran for the innermost room of the Center's staff offices—as she had told her mother she would if she ever found herself in a dangerous situation at the Center—where there was a phone and a door that she could lock behind her. She almost made it. Although the exact sequence of events is unclear, the State established that Scott's clothing was taken off and that a violent struggle ensued, in which [Petitioner] beat and battered Scott, using his fists, a compass, a golf club (which ended up in pieces), and a wooden coat rack. The forensic evidence—including the condition of Scott's nude, bruised, and bloodied body—established that she was moving throughout the attack, until the

final crushing blows with the coat rack, which pierced her skull and ended her life.

Id. (quoting Mitchell, 136 P.3d at 676–77).

## II.  Standard of Review.

### A.    Exhaustion as a Preliminary Consideration.

The exhaustion doctrine is a matter of comity.  It provides that before a federal court can grant habeas relief to a state prisoner, it must first determine that he has exhausted all of his state court remedies.  As acknowledged in Coleman v. Thompson, 501 U.S. 722, 731 (1991), "in a federal system, the States should have the first opportunity to address and correct alleged violations of state prisoner's federal rights." While the exhaustion doctrine has long been a part of habeas jurisprudence, it is now codified in 28 U.S.C. § 2254(b). Pursuant to 28 U.S.C. § 2254(b)(2), "[a]n application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State."

### B.    Procedural Bar.

Beyond the issue of exhaustion, a federal habeas court must also examine the state court's resolution of the presented claim.  "It is well established that federal courts will not review questions of federal law presented in a habeas petition when the state court's decision rests upon a state-law ground that 'is independent of the federal question and adequate to support the judgment.'" Cone v. Bell, 556 U.S. 449, 465 (2009) (quoting Coleman, 501 U.S. at 729).  "The doctrine applies to bar federal habeas when a state court declined to address a prisoner's federal claims because the prisoner had failed to meet a state procedural requirement." Coleman, 501 U.S. at 729-30.

## C.    Merits.

When a petitioner presents a claim to this Court, the merits of which have been addressed in state court proceedings, 28 U.S.C. § 2254(d) governs his ability to obtain relief.  Cullen v. Pinholster, 563 U.S. 170, 181 (2011) (acknowledging that the burden of proof lies with the petitioner).  Section 2254(d) provides as follows:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

The focus of Section 2254(d) is on the reasonableness of the state court's decision. "The question under AEDPA [Antiterrorism and Effective Death Penalty Act of 1996] is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable—a substantially higher threshold." Schriro v. Landrigan, 550 U.S. 465, 473 (2007).

"Under § 2254(d), a habeas court must determine what arguments or theories supported . . . the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of [the Supreme] Court."  Harrington v. Richter, 562 U.S. 86, 102 (2011).  Relief is warranted only "*where there is no possibility fairminded jurists could disagree that the state court's decision conflicts with [the Supreme Court's] precedents.*"  Id. (emphasis added).  The deference embodied in

"Section 2254(d) reflects the view that habeas corpus is a 'guard against extreme malfunctions in the state criminal justice systems,' not a substitute for ordinary error correction through appeal." Id. at 102-03 (citation omitted).  When reviewing a claim under Section 2254(d), review "is limited to the record that was before the state court that adjudicated the claim on the merits."  Pinholster, 563 U.S. at 181.

### III.  Analysis.

### A.      Ground I:  Reassertion of Previously Raised Brady[5] Claim.

In his first ground for relief, Petitioner reasserts the Brady claim he raised in his first habeas petition. Although Petitioner was granted relief on this claim in the form of a conditional writ by which the State was required to retry him on the rape and sodomy charges (or dismiss them) and provide him a resentencing proceeding for his murder conviction, Petitioner argues that he should have been given even greater relief, namely, a whole new trial (guilt and sentencing) on his murder conviction. Under the plain language of 28 U.S.C. § 2244(b)(1), Petitioner cannot proceed on this claim.  Section 2244(b)(1) states that "[a] claim presented in a second or successive habeas corpus application under section 2254 that was presented in a prior application *shall be dismissed.*" (Emphasis added). Petitioner raised this very claim before and therefore he cannot raise it again.  Requesting different relief does not change the substance of the claim.

The Supreme Court's decision in Magwood v. Patterson, 561 U.S. 320 (2010), does not alter the Court's ruling. Although the Magwood Court determined that a second habeas petition following a capital resentencing proceeding was not a second and successive application, it not only left open the question of whether a returning state court prisoner could challenge anew his underlying conviction in that subsequent

_____

[5] Brady v. Maryland, 373 U.S. 83 (1963).

application, id. at 342, but it also did not address the situation presented in this case where the claim now presented was in fact raised and adjudicated in the prior proceeding. However, even if Magwood were construed to allow Petitioner to re-raise this claim, the Court would nevertheless find that Petitioner is not entitled to the additional relief he requests.

A Brady violation occurs when the prosecution suppresses material evidence. "[E]vidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." United States v. Bagley, 473 U.S. 667, 682 (1985). "In a case involving convictions for multiple counts, analysis of whether confidence in the verdict remains 'must be assessed count by count.'" United States v. Bagcho, ___ F. Supp. 3d ___, 2015 WL 9216604, at *10 (D.D.C. Dec. 17, 2015) (quoting United States v. Johnson, 592 F.3d 164, 171 (D.C. Cir. 2010)). "The mere possibility that an item of undisclosed information might have helped the defense, or might have affected the outcome of the trial, does not establish 'materiality' in the constitutional sense." United States v. Agurs, 427 U.S. 97, 109-10 (1976).

In Petitioner's case, the Brady violation was based on "the prosecution's failure to provide the DNA evidence linking [Ms. Scott's boyfriend] to the semen on Ms. Scott's panties, and revealing that Petitioner's DNA was not found in any of the samples tested . . . ." Mitchell, 150 F. Supp. 2d at 1228. Adding insult to this constitutional injury was the testimony given at trial by Joyce Gilchrist, a forensic chemist for the Oklahoma City Police Department.[6]

---

[6] "Nicknamed 'Black Magic' for her seeming ability to get lab results no other chemist could," Ms. Gilchrist "was fired in 2001 for doing sloppy work and giving false or misleading testimony." Mark Hansen, *Crimes in the Lab*, 99-SEP A.B.A. J. 44, 47 (Sept. 2013).

> Gilchrist's testimony that the DNA tests on the semen were "inconclusive," or "inconclusive as to" Petitioner, was, at least, misleading. When she testified at trial, Gilchrist knew the semen on Ms. Scott's panties was not consistent with both Petitioner and [Ms. Scott's boyfriend]. She knew the semen was at least a preliminary match for [Ms. Scott's boyfriend] *and* that Petitioner's DNA had *not* been found on the panties. Thus, the DNA test results were far from inconclusive.

Id. at 1229. There is no question that this evidence[7] undermined the jury's verdict on the rape and sodomy charges. As stated by the Tenth Circuit, "the jury convicted [Petitioner] of rape and forcible anal sodomy despite evidence it did not hear indicating that no such assault had taken place." Mitchell, 262 F.3d at 1064. The Tenth Circuit surmised that had the defense been given this information, "there [was] at least a reasonable probability that . . . it would have succeeded in getting those charges dismissed prior to the trial." Id. at 1065. As for sentencing, the Tenth Circuit found that this same evidence undermined its confidence in Petitioner's death sentence.

> [W]e simply cannot be confident that the jury would have returned the same sentence had no rape and sodomy evidence been presented to it. First and foremost, the rape and sodomy evidence impacted all three of the aggravating circumstances found by the jury: that the murder was heinous, atrocious and cruel; that it was committed to avoid arrest for the rape and sodomy; and that [Petitioner] posed a continuing threat to society. Moreover, the defense presented considerable mitigating evidence for the jury to weigh against the aggravating circumstances it found. That evidence included [Petitioner's] youth (18); his loving relationships with his extended family and friends, which showed a totally different side of his character; and his intelligence (he had been in a program for the gifted and talented children in his elementary

---

[7] This, however, was not the only DNA evidence in the case. As discussed herein, additional DNA evidence confirmed Petitioner's own admission that although he did not rape or sodomize Ms. Scott, he did masturbate on her, leaving his sperm (and his DNA) on one of Ms. Scott's pubic hairs.

school). In addition, Dr. Wanda Draper, a psychologist with a PhD in human development, testified at the sentencing hearing about [Petitioner's] developmental history, concluding that he would do well in a structured environment such as the one he experienced in the juvenile facility where he was a leader among his peers. This evidence enabled defense counsel to argue that [Petitioner's] life was worth saving and that he would do well in a prison environment if the jury sentenced him to life without parole. Under these circumstances, we are persuaded [Petitioner] has met the <u>Kyles</u> standard by showing that absent the <u>Brady</u> violation, there is a reasonable probability the result of the sentencing proceeding would have been different. See <u>Kyles</u>, 514 U.S. at 435, 115 S.Ct. 1555.

<u>Mitchell</u>, 262 F.3d at 1065-66.

To obtain <u>Brady</u> relief for his murder conviction, Petitioner must show that the suppressed forensic evidence affected the jury's determination of his guilt. "[I]f the omitted evidence creates a reasonable doubt that did not otherwise exist, constitutional error has been committed. . . . If there is no reasonable doubt about guilt whether or not the additional evidence is considered, there is no justification for a new trial." <u>Agurs</u>, 427 U.S. at 112-13. In support of his request for relief, Petitioner makes three assertions: (1) that he was forced to testify in his first trial in order to deny the rape and sodomy charges; (2) that the rape and sodomy charges "were inherently intertwined" with the murder charge; and (3) that "[t]aking away the rape and sodomy charges diminishes greatly the evidence supporting a finding of malice aforethought." Petition, pp. 17, 19. However, none of these assertions demonstrates a reasonable probability that, had the evidence in question been disclosed, the jury would have entertained a reasonable doubt as to Petitioner's guilt for the murder.

First, Petitioner has not shown how his testifying in his first trial correlates to the jury's finding of guilt on the murder charge. While he states that he was forced

to testify in order to counteract Ms. Gilchrist's testimony,[8] he does not assert how his testimony factored into the jury's verdict. In fact, Petitioner even acknowledges that the jury already knew of his admissions "to being present and masturbating to ejaculation." Petition, p. 17. In addition, Petitioner was connected to the murder scene by eyewitness testimony and by "unchallenged evidence of sperm attributable to Petitioner being found on Ms. Scott's clothing and in the public [sic] combings . . . ." Mitchell, 150 F. Supp. 2d at 1199-1200, 1229 n.53.[9]

Second, Petitioner's assertion that the rape, sodomy, and murder "were inherently intertwined" does not address how the jury's murder verdict would have been affected had the suppressed evidence been disclosed. Although Petitioner was tried for these charges together, along with the additional charges of robbery (for taking Ms. Scott's personal property) and larceny (for stealing her car), the jury was instructed on the elements of each crime, and so although they were related in time and place, the elements were distinct (O.R. I, 44-54). The fact that Petitioner did not rape or sodomize Ms. Scott does not lessen his culpability for the murder, especially when he admitted to being present and masturbating on her.

Third, while Petitioner contends that the evidence supporting malice aforethought "diminishes greatly" when the rape and sodomy charges are separated from the murder charge, the Court strongly disagrees. The jury was instructed that malice aforethought is "a deliberate intention to take away the life of a human being"

---

[8] In addressing another one of Petitioner's claims (Ground V herein), the OCCA found this assertion untenable: "the reason [Petitioner] took the witness stand in his first trial was to explain why he had given so many different stories to the police, both before and after he was arrested, and to exculpate himself and inculpate "C. Ray." Mitchell, 235 P.3d at 654.

[9] At his second resentencing, forensic expert Brian Wraxall testified that semen found on a pubic hair of Ms. Scott matched Petitioner's DNA at nine loci. Mr. Wraxall testified that the probability of finding the same match elsewhere in the population was one in nine trillion (Tr. IV, 866-76).

(O.R. I, 45), and the evidence which supports this finding stands on its own, independent and untainted by the suppressed forensic evidence. Petitioner violently attacked Ms. Scott with his fists and items he found within his reach, including a compass, a golf club, and a wooden coat rack, and he did not stop until he had killed her. Ms. Scott was found nude and bruised in a pool of blood, with a fractured skull and exposed brain matter. Even more than the absence of a reasonable probability, the Court harbors no doubt that the jury's finding of malice aforethought murder was not affected by the suppressed forensic evidence (and Ms. Gilchrist's related testimony).

For the foregoing reasons, the Court concludes that Petitioner's Ground I should be dismissed, or in the alternative, denied for lack of merit.

### B. Grounds II, XIII, and XIX: Cruel and Unusual Punishment.

In Grounds II, XIII, and XIX, Petitioner sets forth three reasons why his death sentence constitutes cruel and unusual punishment under the Eighth Amendment. All three of these claims were presented to the OCCA and denied on the merits. Mitchell, 235 P.3d at 658-60, 665.

In Ground II, Petitioner asserts that because he has yet to be executed for the murder he committed in 1991, his death sentence is unconstitutional. Petitioner argues that "[t]o subject anyone to the death penalty after two such egregiously flawed proceedings, permitting a third bite at the apple following such blatant contempt for constitutional jurisprudence, is cruel and unusual, and contrary to the basic tenets of Due Process." Petition, pp. 26-27. Petitioner additionally asserts that "[t]here is no penological justification for carrying out a death sentence after so many years against a barely 18 year old offender who has 20 years hence behaved so impeccably . . . ." Id. at 27. Petitioner presents this claim even though he acknowledges that the

Supreme Court has not addressed this issue. Id. The OCCA denied Petitioner relief for this very reason. Mitchell, 235 P.3d at 665.

The Supreme Court has been given multiple opportunities to address the issue Petitioner raises in his Ground II, but yet it has repeatedly declined to take the issue up. See Boyer v. Davis, No. 15-8119, 2016 WL 1723586 (May 2, 2016) (denying certiorari where petitioner had been "under threat of execution" for thirty-two years); Muhammad v. Florida, ___ U.S. ___, 134 S. Ct. 894 (2014) (denying certiorari and a stay of execution on a similar claim); Valle v. Florida, ___ U.S. ___, 132 S. Ct. 1 (2011) (denying certiorari and a stay of execution where petitioner had been on death row for thirty-three years); Johnson v. Bredesen, 558 U.S. 1067 (2009) (denying certiorari and a stay of execution where petitioner had been on death row for twenty-nine years); Allen v. Ornoski, 546 U.S. 1136 (2006) (denying certiorari and a stay of execution where petitioner was a wheelchair-confined, seventy-six-year-old blind diabetic who had been on death row for twenty-three years); Knight v. Florida, 528 U.S. 990 (1999) (denying certiorari where petitioners had been on death row for twenty years or more); Elledge v. Florida, 525 U.S. 944 (1998) (denying certiorari where petitioner had been on death row for twenty-three years); Lackey v. Texas, 514 U.S. 1045 (1995) (denying certiorari where petitioner had been on death row for seventeen years).

In addition to the absence of Supreme Court authority, the Tenth Circuit has found that Petitioner's claim lacks merit. In Stafford v. Ward, 59 F.3d 1025, 1028 (10th Cir. 1995), the petitioner claimed that an Eighth Amendment violation resulted from his fifteen years on death row, "during which time he faced at least seven execution dates." In denying relief, the Tenth Circuit noted the absence of authoritative case law:

> To our knowledge, there is no reported federal case that has adopted the position advocated by Appellant. Although two Supreme Court justices have expressed the view that lower federal courts should grapple with this issue, those views do not constitute an endorsement of the legal theory, which has never commanded an affirmative statement by any justice, let alone a majority of the Court.

Id. See also Jones v. Gibson, 206 F.3d 946, 959 n.6 (10th Cir. 2000) (citing Stafford and denying Eighth Amendment relief where the petitioner had been on death row for twenty years).

Other circuits have found a lack of merit to the claim as well. In Chambers v. Bowersox, 157 F.3d 560, 568 (8th Cir. 1998), the petitioner had been on death row for fifteen years. In denying Eighth Amendment relief, the Eighth Circuit held as follows:

> We believe that delay in capital cases is too long. But delay, in large part, is a function of the desire of our courts, state and federal, to get it right, to explore exhaustively, or at least sufficiently, any argument that might save someone's life. Chambers's strongest argument is that the State has had to try him three times before getting it right. That is true, but there is no evidence, not even a claim, that the State has deliberately sought to convict Chambers invalidly in order to prolong the time before it could secure a valid conviction and execute him. We believe the State has been attempting in good faith to enforce its laws. Delay has come about because Chambers, of course with justification, has contested the judgments against him, and, on two occasions, has done so successfully. If it is not cruel and unusual punishment to execute someone after the electric chair malfunctioned the first time, see Louisiana ex rel. Francis v. Resweber, 329 U.S. 459, 67 S.Ct. 374, 91 L.Ed. 422 (1947), we do not see how the present situation even begins to approach a constitutional violation.

Id. (footnote omitted). See also Thompson v. Sec'y for Dep't of Corr., 517 F.3d 1279, 1283-84 (11th Cir. 2008) (finding no merit to prolonged confinement claim).

In light of all of this authority, it is clear that Petitioner has not shown that the OCCA's decision is contrary to or an unreasonable application of Supreme Court law, and therefore, Ground II is denied.

In Ground XIII, Petitioner argues that his death sentence is unconstitutional in light of the Supreme Court's decision in Roper v. Simmons, 543 U.S. 551 (2005). In Roper, 543 U.S. at 578, the Supreme Court held that "[t]he Eighth and Fourteenth Amendments forbid imposition of the death penalty on offenders who were under the age of 18 when their crimes were committed." Although by its express terms Roper does not apply to Petitioner, Petitioner argues that its rationale does and that he should be relieved of his death sentence because of his youthfulness. Petition, pp. 65-68. He also contends that Roper should be construed to prevent the State from relying on juvenile adjudications to support the continuing threat aggravator as was done in his case. Id. at 68-69.

Petitioner presented his Ground XIII to the OCCA on direct appeal. As issues of first impression, the OCCA discussed them at length. Mitchell, 235 P.3d at 658-60. With respect to his first issue, the OCCA denied relief based on Roper's bright line rule.

> The U.S. Supreme Court has drawn a bright line at eighteen (18) years of age for death eligibility and we therefore reject [Petitioner's] argument that being two weeks beyond his eighteenth birthday at the time of the murder exempts him from capital punishment. Under the plain language of Roper, the prohibition against capital punishment is limited to the execution of an offender for any crime committed before his 18th birthday.

Mitchell, 235 P.3d at 659. The OCCA's application of Roper is not only reasonable, but absolutely correct. In arriving at its holding, the Supreme Court stated as follows:

> Drawing the line at 18 years of age is subject, of course, to the objections always raised against categorical rules. The qualities that

distinguish juveniles from adults do not disappear when an individual turns 18. By the same token, some under 18 have already attained a level of maturity some adults will never reach. For the reasons we have discussed, however, a line must be drawn. . . . The age of 18 is the point where society draws the line for many purposes between childhood and adulthood. It is, we conclude, the age at which the line for death eligibility ought to rest.

Roper, 543 U.S. at 574. Because Petitioner was eighteen years old when he committed his crime, Roper clearly does not apply to him, and Petitioner's argument for an extension of Roper is not a basis for habeas relief. See Pinholster, 563 U.S. at 182 ("State-court decisions are measured against [the Supreme] Court's precedents as of 'the time the state court renders its decision.'") (quoting Lockyer v. Andrade, 538 U.S. 63, 71–72 (2003)).

As to the second issue, the OCCA held as follows:

This Court has consistently held that evidence of unadjudicated bad acts, non-violent bad acts and juvenile offenses are admissible in a capital case to prove a defendant constitutes a continuing threat to society. Douglas v. State, 1997 OK CR 79, ¶¶ 85–87, 951 P.2d 651, 675–76 and cases cited therein. Nothing in the language of Roper suggests that the State is prohibited from relying on prior juvenile adjudications to support an aggravating circumstance.

. . . .

We find nothing in Roper to support [Petitioner's] claim of exclusion from the death penalty and no abuse of discretion in the trial court's admission of [Petitioner's] prior juvenile adjudication to support the "continuing threat" aggravator. Further, [Petitioner] has failed to show any resulting prejudice by the admission of his juvenile adjudication as the jury rejected both the "continuing threat" and the "avoid arrest" aggravators that relied on the evidence.

Mitchell, 235 P.3d at 659-60. Here again, the OCCA cannot be faulted for its proper interpretation of Roper. Because Roper does address the use of juvenile adjudications

in capital proceedings, the OCCA's denial of relief is neither contrary to or an unreasonable application of it. For these reasons, Petitioner's Ground XIII is also denied.

In Ground XIX, Petitioner challenges Oklahoma's method of execution. Because Petitioner does not challenge the constitutional validity of his death sentence but only how the State intends to carry it out, the Court finds that his Ground XIX is not cognizable in this habeas action. Glossip v. Gross, 576 U.S. ___, 135 S. Ct. 2726, 2738 (2015) (acknowledging the holding of Hill v. McDonough, 547 U.S. 573 (2006), "that a method-of-execution claim must be brought under [42 U.S.C.] § 1983 because such a claim does not attack the validity of the prisoner's conviction or death sentence"); Hill, 547 U.S. at 579-80 (discussing the differences between habeas and § 1983 actions and finding that a challenge to a lethal injection protocol was properly filed as a § 1983 case). Petitioner's claim must be brought under § 1983, and in fact, Petitioner has already done so. See Glossip v. Gross, Case No. CIV-14-665-F (W.D. Okla. filed June 25, 2014).

For the reasons set forth above, relief is unwarranted on Petitioner's Grounds II, XIII, and XIX, and they are hereby denied.

## C. Ground III: Ineffective Assistance of Trial and Appellate Counsel.

In Ground III, Petitioner asserts that his trial counsel was ineffective for failing to investigate and obtain evidence to impeach the State's blood spatter and crime reconstruction expert, Tom Bevel. Petitioner argues that if his trial counsel had undertaken the proposed investigation, there would have been insufficient evidence to prove the especially heinous, atrocious, or cruel aggravator beyond a reasonable doubt. Petitioner additionally faults his appellate counsel for failing to raise this claim on direct appeal. Petitioner raised this claim on post-conviction. The OCCA addressed the merits and denied relief. Mitchell, No. PCD-2008-356, slip op. at 3-5,

6-10. Respondent asserts that Petitioner's Ground III must be denied because Petitioner has failed to show that the OCCA's decision is contrary to or an unreasonable application of <u>Strickland v. Washington</u>, 466 U.S. 668 (1984).[10]

"[T]he Sixth Amendment does not guarantee the right to perfect counsel; it promises only the right to effective assistance . . . ." <u>Burt v. Titlow</u>, 571 U.S.___, 134 S. Ct. 10, 18 (2013). Whether counsel has provided constitutional assistance is a question to be reviewed under the familiar standard set forth in <u>Strickland</u>. To obtain relief, a petitioner is required to show not only that his counsel performed deficiently, but that he was prejudiced by it. <u>Strickland</u>, 466 U.S. at 687. The assessment of counsel's conduct is "highly deferential," and a petitioner must overcome the strong presumption that counsel's actions constituted sound trial strategy. <u>Id.</u> at 689. A showing of prejudice under <u>Strickland</u> "is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." <u>Id.</u> at 694.

In <u>Richter</u>, the Supreme Court addressed not only the limitations of the AEDPA, but how those limitations specifically apply to a claim of ineffective assistance of counsel that a state court has denied on the merits. "A state court's determination that a claim lacks merit precludes federal habeas relief so long as fairminded jurists could disagree on the correctness of the state court's decision."

---

[10] Respondent additionally asserts that to the extent Petitioner raises an Eighth Amendment violation, such claim is unexhausted. Response, p. 28. Petitioner's sole reference to the Eighth Amendment is in his proposition heading. Petition, p. 29. The Court finds that this, without more, is insufficient to raise the claim, and in any event, because Petitioner did not assert an Eighth Amendment violation when he raised his ineffectiveness claim on post-conviction, it is unexhausted and subject to an anticipatory procedural bar. <u>See</u> <u>Lott v. Trammell</u>, 705 F.3d 1167, 1179 (10th Cir. 2013) (citing <u>Anderson v. Sirmons</u>, 476 F.3d 1131, 1139-40 n.7 (10th Cir. 2007), and applying an anticipatory procedural bar to an unexhausted claim).

Richter, 562 U.S. at 101 (internal quotation marks and citation omitted). The Supreme Court bluntly acknowledged that "[i]f this standard is difficult to meet, that is because it was meant to be." Id. at 102.

> [The AEDPA] preserves authority to issue the writ in cases where there is no possibility fairminded jurists could disagree that the state court's decision conflicts with [the Supreme] Court's precedents. It goes no further. Section 2254(d) reflects the view that habeas corpus is a guard against extreme malfunctions in the state criminal justice systems, not a substitute for ordinary error correction through appeal.

Id. at 102-03 (internal quotation marks and citation omitted). When these limits imposed by the AEDPA intersect with the deference afforded counsel under Strickland, a petitioner's ability to obtain federal habeas relief is even more limited.

> Surmounting Strickland's high bar is never an easy task. An ineffective-assistance claim can function as a way to escape rules of waiver and forfeiture and raise issues not presented at trial, and so the Strickland standard must be applied with scrupulous care, lest intrusive post-trial inquiry threaten the integrity of the very adversary process the right to counsel is meant to serve. Even under de novo review, the standard for judging counsel's representation is a most deferential one. Unlike a later reviewing court, the attorney observed the relevant proceedings, knew of materials outside the record, and interacted with the client, with opposing counsel, and with the judge. It is all too tempting to second-guess counsel's assistance after conviction or adverse sentence. The question is whether an attorney's representation amounted to incompetence under prevailing professional norms, not whether it deviated from best practices or most common custom.

> Establishing that a state court's application of Strickland was unreasonable under § 2254(d) is all the more difficult. The standards created by Strickland and § 2254(d) are both highly deferential, and when the two apply in tandem, review is doubly so[.] The Strickland standard is a general one, so the range of reasonable applications is substantial. Federal habeas courts must guard against the danger of equating unreasonableness under Strickland with unreasonableness under § 2254(d). When § 2254(d) applies, the question is not whether counsel's

> actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied <u>Strickland's</u> deferential standard.

<u>Richter</u>, 562 U.S. at 105 (internal quotation marks and citations omitted).

After reviewing all aspects of the murder, including the physical evidence, crime photographs/diagrams, prior testimony, police reports, autopsy report, and Petitioner's statements to police, Mr. Bevel testified as to how he believed the murder occurred. Relevant to the especially heinous, atrocious, or cruel aggravator, Mr. Bevel described a struggle that began in one part of the building and ended where Ms. Scott's body was found. In his opinion, Ms. Scott was not walking to a safer location in the building, but "fleeing" there. After an unsuccessful attempt to lock herself inside an inner office, Ms. Scott's clothes were pulled off. Once her clothes were off, Petitioner masturbated on her, stabbed her in the neck five times with a compass, and struck her at least six times with a golf club and a wooden coat rack. Although Mr. Bevel did not give any opinion as to how long the attack lasted or how long Ms. Scott maintained consciousness, he did testify that the bruising on her wrists and pelvic area were indications that she struggled with Petitioner as he exercised control over her and masturbated on her; that the stab wounds to her neck had a "vital reaction" which meant she was still alive when they were inflicted; and that the blood pattern around her body and the multi-directional blood spatter in the room showed significant movement as she was receiving these injuries (Tr. V, 953-56, 958-65, 968-75, 977-82, 984-88, 1002-03, 1006-12, 1021; Court's Exhibit 7).

Petitioner claims that Mr. Bevel's testimony could have been impeached with evidence that challenged his time line of events (Court's Exhibit 7). The evidence concerns Jesse Richards, a city worker who testified at Petitioner's first trial. Mr. Richards testified that he and another city employee were at the Pilot Center from about 2:20-2:50 p.m. on the day of the murder, that the parking lot was empty, and

that no one was in the building. <u>Mitchell</u>, 884 P.2d at 1192. Contrary to his testimony, Petitioner claims that Mr. Richards has since stated that they actually arrived at the Center around 12:45 p.m. and left between 1:45 and 2:00 p.m.[11] Petitioner asserts that this evidence may have been used to show that the murder actually "happened *after* [Petitioner] met Mr. Biggs at the door, *not* before," as referenced on Mr. Bevel's "Most Probable Sequence of Major Events." Court's Exhibit 7; Petition, pp. 32, 34.[12]

In denying Petitioner relief on this claim, the OCCA discussed Petitioner's supporting evidence at length, but ultimately concluded that Petitioner had not demonstrated prejudice because the evidence would not have impeached Mr. Bevel's testimony. <u>Mitchell</u>, No. PCD-2008-356, slip op. at 6-10. The OCCA questioned Mr. Richards' new time frame, given some nineteen years after the murder, noting it

> is inconsistent with all of the other evidence. Petitioner is the only person to have ever said that there was anyone else in the Pilot Center at the time of the murder except for himself and [Ms. Scott]. And his

---

[11] Petition, p. 30 (referencing Exhibit E to the Appendix filed in support of his application for post-conviction relief). Petitioner also states that the alarm at the Center may have been turned off and on at 2:34 p.m. Despite a statement by an alarm company employee to that effect, the computer print-out of activity did not show that the alarm had been turned on and off at that time. Petition, p. 31 (referencing Exhibit D to the Appendix filed in support of his application for post-conviction relief).

[12] Alan Biggs, another city worker, testified at the second resentencing that he stopped by the Center around 1:45 p.m. When he arrived, there was a red car (Ms. Scott's car) running in the parking lot. Petitioner met him at the door and told him that the Center was closed because they were cleaning the restrooms. Mr. Biggs described his encounter with Petitioner as unusual, and he left without entering the building and with a feeling that something was not right (Tr. III, 709-20). <u>See</u> <u>Mitchell</u>, 884 P.2d at 1191-92 (discussing Mr. Biggs' similar testimony at Petitioner's original trial).

claims of a third party perpetrator/perpetrators have consistently been found at odds with the forensic evidence.

Id. at 9. The OCCA also found that Mr. Bevel's "testimony was not the only testimony regarding [Ms. Scott's] conscious physical suffering" and that "[t]here was sufficient other evidence admitted in support of the 'especially heinous, atrocious, or cruel' aggravator from which the jury could find [Ms. Scott] consciously suffered prior to her death." Id. at 9-10.

As Respondent asserts, Petitioner has not shown the OCCA's determination to be contrary to or an unreasonable application of Strickland. Related to the OCCA's finding that Mr. Richards' new time frame is inconsistent with the presented evidence, Petitioner even acknowledges that it "is inconsistent with [Mr. Richards] not seeing Ms. Scott's car in the parking lot." Petition, p. 30. If Mr. Richards had in fact arrived at the Center at 12:45 p.m., or at anytime between 12:45 and 1:35-1:45 p.m., both Ms. Scott and her boss, Carolyn Ross, would have been there. Ms. Ross testified that when she left the Center between 1:35 and 1:45 p.m., Petitioner and Ms. Scott were the only ones in the Center. Although Ms. Ross had put in a call for city workers to come to the Center to fix a leaking roof, she was still expecting them when she left and both her truck and Ms. Scott's car were in the parking lot at that time (Tr. III, 653-54, 669-75). When Mr. Biggs arrived, Ms. Ross had already left as the only car he saw in the parking lot was Ms. Scott's and it was running (Tr. III, 713, 720).

In addition to its inconsistency, Petitioner's evidence regarding Mr. Richards also lacks credibility. It is hearsay evidence,[13] which is inherently unreliable, and it offers no detail regarding the circumstances under which it was obtained. The investigator's affidavit does not reflect that Mr. Richards was even asked about his prior testimony or given an opportunity to explain the time inconsistency. It is axiomatic that memories fade and that the most reliable evidence would be the sworn

---

[13] Mr. Richards' statements are presented in an affidavit executed by the investigator. No reason is given as to why Mr. Richards did not execute his own affidavit.

testimony Mr. Richards gave at trial in the year following the murder. Mitchell, 235 P.3d at 645 (noting that Petitioner's first trial was held in June 1992). Yet Petitioner's evidence offers no explanation for why Mr. Richards' statements given nineteen years after the murder should be accepted as more credible.

Finally, and most importantly, even if trial counsel had used this evidence to impeach Mr. Bevel, it would not have called into question the jury's finding of the especially heinous, atrocious, or cruel aggravator. This aggravating circumstance requires "the State to show that the murder of the victim was preceded by torture or serious physical abuse, which may include the infliction of either great physical anguish or extreme mental cruelty." Mitchell, 235 P.3d at 664. Once this showing is made, "the attitude of the killer and the pitiless nature of the crime can also be considered." Id. Irrespective of the time line of events, Petitioner's evidence does not call into question Mr. Bevel's testimony about the nature and extent of Ms. Scott's injuries and the blood evidence which shows that Ms. Scott struggled with Petitioner, was moving throughout the attack, and was therefore alive and conscious as she fought for her life. Moreover, as the OCCA noted, there was additional evidence supporting the aggravator. In addition to the medical examiner's testimony regarding Ms. Scott's injuries–that many of them were antemortem and would not have caused unconsciousness (Tr. V, 1121-22; Court's Exhibit 4, pp. 83-85, 96-97, 100-01, 108-11), both Petitioner's statements to police and his own testimony support a finding that Ms. Scott suffered serious physical abuse and that her murder was especially heinous, atrocious, or cruel. Although Petitioner has continually downplayed his involvement and placed the blame for Ms. Scott's death on others, his multiple versions of "the truth" have provided detail as to how Ms. Scott was attacked, the physical abuse she took, and the pain she suffered. According to own his testimony (given in 1992 and introduced in his second resentencing), Ms. Scott's screams were

such that they still haunt him (Tr. V, 1071-81, 1085-86; Tr. VI, 1154; Court's Exhibit 9, pp. 1256-68, 1287). In light of all of these circumstances and the established evidence, Petitioner has not shown the OCCA reached a decision contrary to or an unreasonable application of Strickland when it denied him relief on this claim. Ground III is therefore denied.

### D.     Ground IV:  Jackson v. Denno[14] Hearing.

In Ground IV, Petitioner asserts that he should have been given a second Jackson v. Denno hearing prior to the admission of his statements to police in his second resentencing proceeding.[15]  Although Petitioner acknowledges that the voluntariness of his statements had already been determined in prior state proceedings and in his first federal habeas corpus action, he nevertheless contends that a second hearing was required due to a change in the testimony of Oklahoma City Police Detective John Maddox and the OCCA's decision in McCarty v. State, 977 P.2d 1116, 1131 (Okla. Crim. App. 1998), *vacated,* 114 P.3d 1089 (Okla. Crim. App. 2005) (granting the defendant's application for post-conviction relief on other grounds, vacating his death sentence, and remanding the case to the district court for a new trial).  Petitioner raised this claim on direct appeal, but the OCCA denied relief. Mitchell, 235 P.3d at 653-54.  Because Petitioner has not shown that the OCCA's decision is contrary to or an unreasonable application of Supreme Court law, relief must be denied.

---

[14] 378 U.S. 368 (1964).  In Jackson, 378 U.S. at 377, the Supreme Court held that a defendant who objects to the admission of a confession is entitled to "a fair hearing and a reliable determination on the issue of voluntariness, a determination uninfluenced by the truth or falsity of the confession."

[15] In his proposition heading and in his closing sentence, Petitioner makes reference to the trial court's failure to give the jury an instruction regarding the voluntariness of his statements. Petition, pp. 35, 38.  However, Petitioner makes no argument in support of this additional claim, and therefore, the Court declines to address it.

In denying Petitioner relief on this claim, the OCCA held as follows:

In Proposition II, [Petitioner] contends he should have been accorded a Jackson v. Denno hearing at his resentencing trial. [Petitioner's] custodial statements have repeatedly been found voluntary. See Mitchell I, 1994 OK CR 70, ¶¶ 12–14, 884 P.2d at 1194–1195; Mitchell v. Ward, 150 F.Supp.2d at 1213; Mitchell v. Gibson, 262 F.3d at 1060. [Petitioner] did not seek a petition for rehearing or rehearing *en banc* before the Tenth Circuit nor a petition for a writ of certiorari in the United States Supreme Court to challenge the denial of his involuntary statement claim.

The admissibility of [Petitioner's] previously determined voluntary statements is specifically permitted under 21 O.S.2001, § 701.10a(4) ("[a]ll exhibits and a transcript of all testimony and other evidence properly admitted in the prior trial and sentencing shall be admissible in the new sentencing proceeding").

The only new argument raised by [Petitioner] is that at the second resentencing trial, Detective Maddox testified that [Petitioner] was a suspect when the interviews with police began on September 8, 1991, while in 1992 Detective Maddox testified that [Petitioner] was not a suspect when the interviews began and did not become a suspect until later that day. Contrary to [Petitioner's] claim, this change in testimony does not cast the entire police interview in a different light. Detective Maddox testified in 1992 and in 2007 that [Petitioner] was Mirandized prior to the beginning of the police interview on September 8, 1991. Mitchell I, 1994 OK CR 70, ¶ 5, 884 P.2d at 1192. Maddox's 2007 testimony at most shows a witness with a faulty memory. The trial court's failure to hold a second Jackson v. Denno hearing is not grounds for relief. This proposition is denied.

Mitchell, 235 P.3d at 653-54 (footnotes omitted).

Jackson requires a trial court to hold a hearing outside the presence of the jury to determine the voluntariness of a defendant's statement when he objects to its admission. Jackson, 378 U.S. at 376-77. In compliance with Jackson, Petitioner was given a hearing at the time of his original trial. Mitchell, 884 P.2d at

1192 (referencing the hearing). Petitioner has cited no Supreme Court authority which requires more, and the Court finds no merit to Petitioner's argument that a second hearing was needed due to Detective Maddox's testimony at his second resentencing. Petitioner has not shown that the detective's most recent testimony is anything more than a misrecollection, nor has he shown what difference it would have made in assessing the voluntariness of his statements. The record is clear that Petitioner was advised of his rights in accordance with Miranda v. Arizona, 384 U.S. 436 (1966), and that he waived those rights before any questioning began (Tr. V, 1051-52; State's Exhibit 124). Mitchell, 884 P.2d at 1192 ("Although he was given, and waived, his Miranda rights at the outset . . . .").

The Court also rejects Petitioner's argument that the OCCA's decision in McCarty required that a second hearing be held. In McCarty, the OCCA found that a Jackson v. Denno hearing should have been held in McCarty's resentencing proceeding; however, the facts are markedly different from Petitioner's case. In McCarty, the statements in question related to another murder McCarty had committed, one which the prosecution relied on to prove that he was a continuing threat. Given some unusual circumstances, McCarty never went to trial for that murder, and so when the state sought to use these statements against him, the voluntariness of the statements had never been explored. Although McCarty had requested a Jackson v. Denno hearing, the trial court refused, "finding [McCarty] was not 'in custody' at the time the statements were made." The OCCA found no support for the trial court's ruling:

> [A]lthough many of the Jackson v. Denno cases involve what amounts to a "custodial" confession, we find no binding, authoritative support for the position that a person is required to be in custody before the

voluntariness of his or her confessions or statements can be challenged.
The focus of a <u>Jackson v. Denno</u> hearing is coercion, not custody.

<u>McCarty</u>, 977 P.2d at 1126-31. As the facts demonstrate, <u>McCarty</u> does not stand for the proposition that a <u>Jackson v. Denno</u> hearing is required in Oklahoma resentencing proceedings as a matter of course, and it clearly does not hold that a defendant is entitled to more than one <u>Jackson v. Denno</u> hearing.

Because Petitioner was afforded a <u>Jackson v. Denno</u> hearing, he simply has no viable argument that the OCCA's decision is contrary to or an unreasonable application of <u>Jackson</u> (or any other Supreme Court authority, for that matter). Accordingly, Ground IV is denied.

**E.    Ground V:  Admission of Petitioner's Prior Testimony.**

In Ground V, Petitioner, relying on the Supreme Court's ruling in <u>Harrison v. United States</u>, 392 U.S. 219 (1968), asserts that his testimony from his original trial should not have been admitted in his second resentencing proceeding because he was impelled to testify due to a <u>Brady</u> violation and the misleading testimony of Ms. Gilchrist.  <u>See</u> Ground I, <u>supra</u>.  Petitioner raised this claim on direct appeal.  The OCCA addressed the merits of the claim and denied relief.  <u>Mitchell</u>, 235 P.3d at 654-55.

In <u>Harrison</u>, a defendant complained about the admission of his prior testimony. In his first trial, Harrison only testified in order to counter three confessions introduced against him.  On appeal, it was determined that the confessions were illegally obtained and therefore erroneously admitted.  On retrial, the confessions were not introduced, but Harrison's prior testimony was.  The question before the Supreme Court was "whether [Harrison's] trial testimony was the inadmissible fruit of the illegally procured confessions."  <u>Harrison</u>, 392 U.S. at 220-21.  The Court found that it was.  "[T]he same principle that prohibits the use of confessions [wrongfully

obtained] also prohibits the use of any testimony impelled thereby–the fruit of the poisonous tree . . . ." Id. at 222. "The question is not *whether* the petitioner made a knowing decision to testify, but *why*. If he did so in order to overcome the impact of confessions illegally obtained and hence improperly introduced, then his testimony was tainted by the same illegality that rendered the confessions themselves inadmissible." Id. at 223.

With reference to Littlejohn v. State, 85 P.3d 287, 298-99 (Okla. Crim. App. 2004), in which the OCCA assumed that Harrison applied outside of the Fifth Amendment context, the OCCA determined that no Harrison violation occurred in Petitioner's case because his testimony was not induced by the Brady/Gilchrist error. The OCCA found as follows:

> The record shows that the reason [Petitioner] took the witness stand in his first trial was to explain why he had given so many different stories to the police, both before and after he was arrested, and to exculpate himself and inculpate "C. Ray." In light of testimony from witnesses at the scene placing [Petitioner] there both before and after the murder, and evidence of his shoe print found in the deceased's blood, [Petitioner's] claim that but for the Gilchrist testimony he would not have testified is untenable.

Mitchell, 235 P.3d at 654. The OCCA also held that even if Petitioner's testimony should have been excluded, any error was harmless beyond a reasonable doubt. Id. at 654-55.

In order for Petitioner to prevail on his Ground V, he must show that the OCCA's decision is contrary to or an unreasonable application of Supreme Court law, namely, Harrison, which he cites in support of his request for relief. However, the Tenth Circuit has made clear that Harrison does not apply outside of the Fifth Amendment context. In Littlejohn v. Trammell, 704 F.3d 817, 849 (10th Cir. 2012), the Tenth Circuit noted that "Harrison was concerned with the Fifth Amendment's

prohibition on law enforcement's unlawful extraction of confessions from defendants[,]" and that "[b]y its terms, Harrison is applicable only where a defendant's testimony is impelled by the improper use of *his own* unconstitutionally obtained confessions *in violation of the Fifth Amendment*." In Littlejohn, the petitioner was seeking to extend Harrison beyond its express holding, an idea the Tenth Circuit unequivocally rejected.

> It is apparent that the rule Mr. Littlejohn advocates for involves the application of Harrison's remedial measure (i.e., suppression) where a defendant's prior testimony is impelled by an alleged *due process violation*. To adopt such a rule would require us inappropriately to extend Harrison to a novel context. See Premo v. Moore, [562] U.S. [115, 127] (2011) ("[N]ovelty . . . [that] renders [a] relevant rule less than 'clearly established' . . . provides a reason to reject it under AEDPA.").

> Whether Harrison ever may be extended beyond its Fifth Amendment confession context is not the question before us. Rather, giving due deference to state court adjudications as AEDPA commands, our threshold concern must be whether Harrison's holding furnished the OCCA with clearly established federal law to resolve Mr. Littlejohn's argument. We answer that question in the negative. For that reason, we reject Mr. Littlejohn's impelled-testimony argument.

Littlejohn, 704 F.3d at 850-51 (footnotes omitted). As in Littlejohn, because Harrison does not apply to Petitioner's circumstances, Petitioner has not established his right to relief and  Ground V is therefore denied.

### F.    Grounds VI, VII and VIII:  Jury Selection.

In Grounds VI, VII, and VIII, Petitioner challenges several aspects of the jury selection process, claiming he was denied his constitutional rights to an impartial jury and due process.  Petitioner raised these claims on direct appeal.  With thorough and detailed analysis, the OCCA addressed the merits of the claims and denied relief.

Mitchell, 235 P.3d at 646-52. Petitioner has not shown that the OCCA's decision is an unreasonable one.

There is no question that "[c]apital defendants have the right to be sentenced by an impartial jury." Uttecht v. Brown, 551 U.S. 1, 22 (2007). "[D]ue process alone has long demanded that, if a jury is to be provided the defendant, regardless of whether the Sixth Amendment requires it, the jury must stand impartial and indifferent to the extent commanded by the Sixth Amendment." Morgan v. Illinois, 504 U.S. 719, 727 (1992). An impartial juror in the capital setting is one who, despite his or her views on capital punishment, can follow the trial court's instructions. Thus, "the proper standard for determining when a prospective juror may be excluded for cause because of his or her views on capital punishment . . . is whether the juror's views would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." Wainwright v. Witt, 469 U.S. 412, 424 (1985) (internal quotations marks omitted).

"[B]ecause determinations of juror bias cannot be reduced to question-and-answer sessions[,]" the printed record cannot fully capture the qualification assessment. Id. at 424-26, 434-35. Reviewing courts must therefore defer to the trial court's determination of whether a particular juror is qualified to serve. "Deference to the trial court is appropriate because it is in a position to assess the demeanor of the venire, and of the individuals who compose it, a factor of critical importance in assessing the attitude and qualifications of potential jurors." Uttecht, 551 U.S. at 9.

Adding to this deference is even more deference–the deference embodied in the AEDPA standard for relief. In Eizember v. Trammell, 803 F.3d 1129, 1135-36 (10th Cir. 2015), the Tenth Circuit recently discussed the interplay of these deferential standards:

How do these established standards play out when we're called on to review not a federal trial court on direct appeal but the reasonableness of a state's application of federal law on collateral review? In [Uttecht] the Court explained that a federal court owes what we might fairly describe as double deference: one layer of deference because only the trial court is in a position to assess a prospective juror's demeanor, and an "additional" layer of deference because of AEDPA's "independent, high standard" for habeas review. See id. at 9–10, 127 S.Ct. 2218. Indeed, the Court stressed that where, as here, the record reveals a "lengthy questioning of a prospective juror and the trial court has supervised a diligent and thoughtful *voir dire*, the trial court has broad discretion" on the issue of exclusion. Id. at 20, 127 S.Ct. 2218.

See also White v. Wheeler, 577 U.S. ___, 136 S. Ct. 456, 460, 462 (2015) (discussing the "doubly deferential" standard: "simple disagreement does not overcome the two layers of deference owed by a federal habeas court in this context") (internal quotation marks omitted).

In Ground VI, Petitioner asserts that "the jury selection process . . . did not comport with due process" because the trial court denied his requests to utilize jury questionnaires and to conduct individual questioning. Petition, p. 43. Characterizing the jury selection process as expedited and short, Petitioner argues that his requests were not only reasonable but necessary to gather "enough information to intelligently exercise his peremptory challenges." Id.

In denying Petitioner relief on this claim, the OCCA made the following findings regarding the jury selection process employed in Petitioner's case:

The record reflects a very thorough *voir dire* was conducted spanning two and half days. Prior to the start of questioning, prospective jurors were informed of their purpose—to decide punishment—and given the three possible punishments. The trial judge explained the Bill of Particulars, the role of aggravating circumstances and mitigating evidence, the State's burden of proof, the process involved in finding the existence of an aggravating circumstance, the weighing of that evidence against the mitigating evidence and the determining of the appropriate

31

sentence. The judge indicated the jury would receive all of this information in written instructions at the close of the evidence. The judge further informed the prospective jurors that a juror needed to be fair and impartial, able to listen to all of the evidence, and consider all three possible punishments.

The record in this case shows that the trial court did not rush through *voir dire*. There is no indication in the record that defense counsel was prevented from asking any questions pertinent to exercising peremptory challenges. [Petitioner] used all nine peremptory challenges. However, nowhere in the record or appellate brief does he request additionally challenges or specify which sitting jurors he would excuse if given additional challenges.

Mitchell, 235 P.3d at 647. Despite these findings of fact, which are afforded a presumption of correctness in this proceeding, 28 U.S.C. § 2254(e)(1), Petitioner asserts, as he did on direct appeal, that the questioning of three prospective jurors shows why jury questionnaires and individual questioning should have be employed in his case. The OCCA addressed this assertion as follows:

In support of his claim, [Petitioner] directs us to responses by three potential jurors during the court's initial questioning. Prospective Jurors R.M. and A.K. stated they remembered reading about [Petitioner's] case in the newspapers. Prospective Juror R.L. stated his wife had been murdered, her murderer was on death row, and the process had been unpleasant for him. [Petitioner] argues that if questionnaires or individual *voir dire* had been allowed the jury pool would not have been exposed to the highly inflammatory responses of the three potential jurors.

. . . .

Prospective Jurors R.M. and A.K. stated they remembered reading about [Petitioner's] case in the newspapers approximately 16 or 17 years earlier. No details of what they remembered reading were given. Both stated they could set aside what they remembered reading and decide the case on the evidence presented at trial.

Because of the obvious difficulty in reviewing juror candidness, we must rely and place great weight upon the trial court's opinion of the jurors. See Eizember, 2007 OK CR 29, ¶ 41, 164 P.3d at 221 ("[d]eference must be paid to the trial judge who sees and hears the jurors", quoting Wainwright v. Witt, 469 U.S. 412, 425, 105 S.Ct. 844, 853, 83 L.Ed.2d 841 (1985)). Here, the trial court, who saw the prospective jurors and heard their responses firsthand, found no need to conduct individual *voir dire*. We find the record supports that conclusion as there is nothing in their responses that indicate the prospective jurors were anything less than candid.

Prospective Juror R.L., after giving the previously cited testimony regarding the murder of his wife, and at the request of defense counsel, was sequestered from the remainder of the jury pool and individual *voir dire* was conducted. At the end of which, he was excused for cause. [Petitioner] has failed to show how this prospective juror's statements about his personal experiences, bereft of any personal opinions, impacted the remainder of the jury pool.

Mitchell, 235 P.3d at 646, 647.

Despite Petitioner's contention that the voir dire conducted in his case should have been something more, it is clear that Petitioner has no constitutional right to demand the method by which a jury is selected. See Skilling v. United States, 561 U.S. 358, 386 (2010) ("No hard-and-fast formula dictates the necessary depth or breadth of *voir dire*."); United States v. Wood, 299 U.S. 123, 145-46 (1936) ("Impartiality is not a technical conception. It is a state of mind. For the ascertainment of this mental attitude of appropriate indifference, the Constitution lays down no particular tests . . . ."). Part and parcel of Petitioner's right to an impartial jury, however, is "an adequate *voir dire* to identify unqualified jurors." Morgan, 504 U.S. at 729. The OCCA found that the voir dire conducted in Petitioner's case was in fact adequate, and because Petitioner has failed to show that this determination is an unreasonable one, his Ground VI must be denied.

In Ground VII, Petitioner objects to the trial court's removal of nine prospective jurors for cause.[16]  Labeling the trial court's questioning of these jurors as "cursory" and "truncated," Petitioner contends that the questions posed to them were inadequate to determine "whether they could set aside generalized opposition to capital punishment sufficiently to follow the law . . . ."  Petition, pp. 44, 46.

In denying Petitioner relief on this claim, the OCCA reviewed the questioning of each of the nine jurors.  It ultimately concluded that two of the prospective jurors, Jurors F.F. and J.P., were not removed due to their views on capital punishment, but "were properly excused due to the influence of outside matters affecting their ability to sit as fair and impartial jurors."  Mitchell, 235 P.3d at 650.  With respect to Juror F.F., the OCCA found as follows:

> Prospective Juror F.F. initially told the court "it was kind of hard to say" whether he could give meaningful consideration to all three punishments. (Tr. Vol. I, pg. 66). Upon further questioning by the court, it became clear the potential juror's knowledge of facts in an unrelated upcoming criminal trial would affect his ability to listen to the case against [Petitioner] and make a decision. Despite the court's decision to excuse the juror, defense counsel was granted additional *in-camera* questioning. As a result, the prospective juror said that because of his knowledge of the other case, he could not be fair to either side in [Petitioner's] case. Over defense counsel's objection, the court excused the juror, stating "he's got something external affecting him . . . it's something that affects him from something else that would affect his ability to give both sides a fair trial." (Tr. Vol. I, pg. 70).

Mitchell, 235 P.3d at 648.  And with respect to Juror J.P., the OCCA found:

> Prospective Juror J.P. initially said he could not consider the death penalty because of religious scruples. Upon further questioning by the

---

[16] Petitioner notes that three of these jurors were African American; however, his scant reference to Batson v. Kentucky, 476 U.S. 79 (1986), and lack of argument, are insufficient to raise the claim.  Petition, pp. 44, 47.

court, the prosecutor and defense counsel, the court found the juror had been equivocal in his answers regarding consideration of the death penalty. During an individual, sequestered *voir dire*, where he was questioned extensively by the court, the prosecutor and defense counsel, J.P. clarified his views and stated he could not consider all three punishments. In excluding J.P. for cause, the court noted that from observing him closely in chambers, J.P. was allowing matters outside the law and evidence, to influence his ability to consider to all three punishments.

Id. at 649.

Regarding Juror F.F., it is clear that his relationship with another capital defendant hampered his ability to consider all three punishments (Tr. I, 65-70), and although Juror J.P. struggled with whether or not he could consider all three, after extensive questioning by the trial court, the prosecutor, and defense counsel, it was clear that his life experience of losing his wife to cancer and his relationship with his fellow parishioners prevented him from doing so (Tr. III, 471-97). Because the record clearly belies Petitioner's contention that these jurors were improperly removed, Petitioner has not shown that the OCCA unreasonably denied him relief with respect to these two jurors. See Uttecht, 551 U.S. at 20 ("But where, as here, there is lengthy questioning of a prospective juror and the trial court has supervised a diligent and thoughtful *voir dire*, the trial court has broad discretion.").

Of the seven remaining jurors, the OCCA found that six of them "were unequivocal in their responses that they could not consider all three punishments." Mitchell, 235 P.3d at 649. "Because these prospective jurors could not consider all of the punishments provided by law, they could not discharge their duties as jurors." Id. Once again, the OCCA's decision is supported by the record:

- Juror P.M. stated that for personal and religious reasons she could not consider the death penalty, that her position was unequivocal, that nothing at all could change her mind, and after further defense

questioning, that she "would never vote for anyone's life to be taken" (Tr. I, 72-75).

- Juror N.B. stated without hesitation that should could not consider all three punishments. She specifically stated that she could not consider the death penalty, that she had felt that way for a "very long time," and that she could think of no circumstances under which she could ever impose a death sentence (Tr. I, 83-84).

- Juror J.W. stated that he could not consider two of the three sentencing options–life without parole and death–because people change. He told the trial court that had felt this way for awhile and that nothing could change his mind (Tr. I, 85-87).

- Juror K.D. told the trial court that "for as long as [she could] remember" she had been against the death penalty. She emphatically stated that she could not give the death penalty under any circumstances, even if the law told her she had to consider all three (Tr. I, 90-91).

- Juror K.B. stated she could not consider the death penalty, that it was eliminated as an option for her consideration, and that she was not going to change her mind under any circumstances and irrespective of instructions which told her she had to consider all three (Tr. I, 91-92).

- Juror M.W. stated that he would exclude the death penalty as an option and that his position was unequivocal (Tr. III, 468-69).

Consequently, Petitioner has not shown that the OCCA unreasonably denied him relief with respect to these six additional jurors.

The final juror challenged by Petitioner is Juror S.A., whom the OCCA acknowledged was not as clear in her responses as the other eight. Although she first stated that she had a "serious" issue with the death penalty, she also seemed to affirm that she could set aside her issue with the death penalty and decide the case. After exchanging apologies for the apparent confusion, the trial court asked in more explicit

and direct terms, "Can you set aside your opinion . . . and not consider it any more and decide the issues in this case or are you period, no death penalty, no matter what[?]" To this question, Juror S.A. answered, "No matter what" (Tr. I, 81-82). In denying relief with respect to Juror S.A., the OCCA found as follows:

> Any ambiguity in S.A.'s responses was cleared up by additional questioning from the trial court. In the potential juror's last recorded answer, she was unequivocal in her decision that she could not consider all three punishments. Therefore, we find no abuse of the trial court's discretion in excusing her for cause.

Mitchell, 235 P.3d at 649. Although the OCCA found that the trial court cleared up Juror S.A.'s ambiguous answers, even if some ambiguity remained, the trial court cannot be faulted. See Witt, 469 U.S. at 434 ("[W]hatever ambiguity [may be found] in this record, we think that the trial court, aided as it undoubtedly was by its assessment of [the juror's] demeanor, was entitled to resolve it in favor of the State."). See also Uttecht, 551 U.S. at 7 (quoting Witt). For all of the foregoing reasons, Petitioner's Ground VII does not entitle him to relief.[17]

Petitioner's Ground VIII is in essence an extension of his Ground VI in that he complains about how the trial court conducted voir dire. Here, Petitioner contends that he should have been allowed to show the prospective jurors some of the crime scene photographs, tell them what specific aggravators the State was alleging, define mitigating evidence, and ask them certain questions about the death penalty. As previously discussed, Petitioner has no constitutional right to dictate the parameters of voir dire, and so long as the jury selection process adequately identifies who is qualified to serve and who is not, the trial court has discretion in the particulars. In

---

[17] In denying Petitioner relief, the OCCA also found that the trial court did not err in rejecting Petitioner's request to ask additional questions to these jurors, and it did not cause confusion when it at times used the terms "meaningful consideration" and "equivocal." Mitchell, 235 P.3d at 649-50.

denying Petitioner relief on these claims, the OCCA found that the trial court acted within its discretion and that Petitioner was not denied his right to an impartial jury.

> A review of the record shows the trial court did not abuse its discretion in the manner in which *voir dire* was conducted. The record clearly shows defense counsel was allowed sufficient *voir dire* to determine if there were grounds to challenge a particular juror for cause and to intelligently exercise peremptory challenges. In many instances, defense counsel's request for individual *voir dire* was granted.

> Now on appeal, [Petitioner] has not stated how he would have used his peremptory challenges differently given additional information nor has he cited to any sitting juror with any prejudices against him. Our review of the record shows a jury free of outside influence, bias and personal interest was selected to hear [Petitioner's] case. Therefore, given the traditionally broad discretion accorded to the trial judge in conducting *voir dire*, and our inability to discern any possible prejudice from not allowing further general questioning, we find [Petitioner's] constitutional rights were not violated by *voir dire*.

Mitchell, 235 P.3d at 651-52. Because Petitioner has not shown that this determination by the OCCA is unreasonable, the Court finds that relief must be denied on his Ground VIII as well.

Where, as here, the trial court is invested with broad discretion to conduct voir dire and the OCCA has addressed all of Petitioner's juror related claims in full and with abundant analysis and sound reasoning supported by the trial record, Supreme Court authority and AEDPA deference mandates that Petitioner's Grounds VI, VII, and VIII all be denied.

### G.    Grounds IX, X, and XI:  General Evidentiary Issues.

In Grounds IX, X, and XI, Petitioner raises evidentiary challenges to the admission of photographs, Mr. Bevel's crime reconstruction testimony, and DNA evidence.  All of these claims were raised by Petitioner on direct appeal and denied by the OCCA on the merits.  Mitchell, 235 P.3d at 655-58.  Addressing each claim in

turn, the Court concludes that Petitioner has not shown that the OCCA's adjudication of these claims is contrary to or an unreasonable application of Supreme Court law.

It is well-established that "[f]ederal habeas review is not available to correct state law evidentiary errors . . . ." Smallwood v. Gibson, 191 F.3d 1257, 1275 (10th Cir. 1999). See also Thornburg v. Mullin, 422 F.3d 1113, 1128-29 (10th Cir. 2005) (quoting Smallwood); Spears v. Mullin, 343 F.3d 1215, 1225-26 (10th Cir. 2003) (same). Thus, when a habeas petitioner complains about the admission of evidence, inquiry is limited to the constitutional issue of whether a due process violation has occurred. The question is whether the admitted evidence rendered the petitioner's trial fundamentally unfair. Id. See Chambers v. Mississippi, 410 U.S. 284, 302 (1973) (finding that the exclusion of critical evidence denied a defendant "a trial in accord with traditional and fundamental standards of due process"). Undefined by specific legal elements, this standard obliges the Court to "tread gingerly" and "exercise considerable self-restraint." Duckett v. Mullin, 306 F.3d 982, 999 (10th Cir. 2002) (internal quotation marks omitted) (quoting United States v. Rivera, 900 F.2d 1462, 1477 (10th Cir. 1990)). No alleged evidentiary error shall be viewed in isolation, but instead considered in light of the entire proceeding. Harris v. Poppell, 411 F.3d 1189, 1197 (10th Cir. 2005) (discussing the application of a fundamental fairness review and quoting Duckett and Le v. Mullin, 311 F.3d 1002, 1013 (10th Cir. 2002)).

In his Ground IX, Petitioner complains about the volume of photographs of Ms. Scott which were admitted. Although Petitioner acknowledges that "the State is entitled to offer some photographic evidence of the crime scene and the victim," he contends that fourteen photographs of her body at the crime scene and eleven autopsy photographs (which were in addition to thirty general crime scene photographs) were excessive and gruesome, and therefore, inflammatory and prejudicial. Petition, p. 52.

In denying Petitioner relief, the OCCA addressed every aspect of Petitioner's claim in significant detail.

> The admissibility of photographs is a matter within the trial court's discretion and absent an abuse of that discretion, this Court will not reverse the trial court's ruling. Warner, 2006 OK CR 40, ¶ 167, 144 P.3d at 887. Photographs are admissible if their content is relevant and their probative value is not substantially outweighed by their prejudicial effect. Id. The probative value of photographs of murder victims can be manifested in numerous ways, including showing the nature, extent and location of wounds, establishing the *corpus delicti*, depicting the crime scene, and corroborating the medical examiner's testimony. Id.

> Many of the photographs in this case were introduced during the testimony of Tom Bevel and illustrated his theory of blood spatter and blood transfer evidence. Bevel testified that the deceased had been stabbed in the neck with the school compass that was found underneath her. He also testified the blood smear and blood transfer evidence showed that the deceased was moving during the attack and that the attack was particularly violent and brutal. Photographs illustrating this testimony aided the jury in understanding the nature of the attack on the deceased and helped explain the final location of her body.

> Autopsy photographs supported the testimony of the medical examiner and aided the jury in understanding the nature of the wounds suffered by the deceased. The photographs were relevant to support the State's allegation of the existence of the "heinous, atrocious or cruel" aggravator as they showed the deceased suffered serious physical abuse prior to her death.

> [Petitioner's] argument that the photographs were unduly prejudicial because the manner of death was not disputed has been previously rejected by this Court. See Patton, 1998 OK CR 66, ¶ 59, 973 P.2d at 290. Likewise, [Petitioner's] argument that the photographs were unduly prejudicial because his guilt was not contested fails. Title 21 O.S.2001, § 701.10a specifically provides that "[a]ll exhibits and a transcript of all testimony and other evidence properly admitted in the prior trial and sentencing shall be admissible in the new sentencing

proceeding[.]" See Fitzgerald v. State, 2002 OK CR 31, ¶ 11, 61 P.3d 901, 905.

Further, [Petitioner's] argument that the photographs were unduly prejudicial because they were gruesome does not warrant relief. In Patton, we said:

> The fact that the photographs may be gruesome does not of itself cause the photographs to be inadmissible. "Gruesome crimes result in gruesome pictures." McCormick v. State, 845 P.2d 896, 898 (Okl.Cr.1993). There is no requirement that the visual effects of a particular crime be down played by the State. Id. "The only consideration to be made is whether the pictures are unnecessarily hideous, such that the impact on the jury can be said to be unfair". Id.

1998 OK CR 66, ¶ 60, 973 P.2d at 290.

As neither the manner of death nor [Petitioner's] guilt is disputed, "[w]e are unable to sympathize with [Petitioner] when he complains that the photos are graphic and are somewhat confused that he would expect them to be otherwise." Smallwood v. State, 1995 OK CR 60, ¶ 35, 907 P.2d 217, 228.

[Petitioner's] complaint about the volume of photographs also does not warrant relief. In Mitchell III, this Court was troubled by the admission of photographs of the crime scene as well as a videotape of the crime scene showing the deceased's body. 2006 OK CR 20, ¶ 53, 136 P.3d at 695. This Court found much of the evidence was admissible, but the trial court had abused its discretion by failing to properly constrain the State in its presentation of the evidence, much of which was cumulative. Id. The record of this second resentencing reflects that the trial court was well aware of this Court's rulings in Mitchell III, and worked hard not to commit the same errors. The crime scene videotape was not admitted into evidence in the second resentencing and the number of photographs admitted was reduced. While there was some duplication in the images reflected in the photographs, [Petitioner] has failed to meet his burden of showing the repetition was needless or inflammatory. Warner, 2006 OK CR 40, ¶ 168, 144 P.3d at 887.

Finally, [Petitioner] finds error in the prosecution's publication of some of the photographs during closing argument, instead of when they were introduced during a witnesses' testimony. Defense counsel argued at trial that withholding the photographs throughout trial until closing argument was so inflammatory as to violate due process and fundamental fairness. Denying [Petitioner's] objection, the trial court found the photographs had been admitted into evidence therefore they could be published to the jury and the jury could take them to deliberations. The judge noted that many of the photographs had been cropped and cut down and that the total number of admissible photographs had been reduced.

[Petitioner] does not cite any authority requiring that all exhibits admitted into evidence be published prior to closing argument. Further, he has failed to show any prejudice resulting from the timing of the admission of the photographs.

Having found the photographs relevant, they may still be excluded from evidence if the probative value of the photographs is outweighed by their prejudicial impact on the jury. 12 O.S.2001, § 2403. "In reviewing the prejudicial impact of photographs this Court has said that '[w]here the probative value of photographs . . . is outweighed by their prejudicial impact on the jury that is, the evidence tends to elicit an emotional rather than rational judgment by the jury then they should not be admitted into evidence.'" Short v. State, 1999 OK CR 15, ¶ 27, 980 P.2d 1081, 1094. Applying that standard to this case, we find the photographs introduced were probative and that probative value was not outweighed by any prejudicial impact. The evidence overwhelmingly supported the "heinous, atrocious or cruel" aggravator and there is no indication the jury's verdict was an emotional response rather than a rational judgment based on the evidence.

Based upon our review of the photographic evidence introduced in this case, we find the errors committed in the first resentencing concerning admission of this evidence were not repeated in this case. The trial court properly "constrained" the State's presentation of this evidence and did not abuse its discretion in the admission of the photographs. This proposition of error is denied.

Mitchell, 235 P.3d at 655-56 (footnote omitted).

In order to prevail on his Ground IX, Petitioner must show that *all* fairminded jurists would disagree with the OCCA's assessment. Frost v. Pryor, 749 F.3d 1212, 1225-26 (10th Cir. 2014) ("Under the test, if *all* fairminded jurists would agree the state court decision was incorrect, then it was unreasonable and the habeas corpus writ should be granted. If, however, *some* fairminded jurists could possibly agree with the state court decision, then it was not unreasonable and the writ should be denied.") (emphasis added); Stouffer v. Trammell, 738 F.3d 1205, 1221 (10th Cir. 2013) (citing Richter, 562 U.S. at 101, for the proposition that relief is warranted "*only if all* 'fairminded jurists' would agree that the state court got it wrong") (emphasis added). Given the OCCA's well-reasoned analysis, the due process standard of review which applies to his claim, and the AEDPA deference afforded the OCCA's decision, Petitioner has not made this showing.[18] Accordingly, relief on Ground IX is denied.

Petitioner's Ground X challenges the admission of Mr. Bevel's testimony. As discussed in Ground III, supra, Mr. Bevel, an expert in blood spatter and crime reconstruction, testified as to how he believed the murder occurred based on the physical evidence, crime photographs/diagrams, prior testimony, police reports, autopsy report, and Petitioner's statements to police. Petitioner contends that Mr. Bevel should not have been allowed to testify because his testimony was cumulative,

---

[18] As Respondent asserts, Petitioner's reference to the Tenth Circuit's decision in Spears is unavailing. Response, pp. 65-66. As in Wilson v. Sirmons, 536 F.3d 1064, 1115 (10th Cir. 2008), and Thornburg, 422 F.3d at 1129, and unlike Spears, the photographs in the present case had a "logical connection" to the State's burden of proof.

irrelevant, and unreliable.[19] Petitioner suggests that the trial court's failure to conduct a Daubert/Kumho[20] hearing contributed to the alleged error.

In denying Petitioner relief on this claim, the OCCA set forth the following analysis:

> In his eighth proposition of error, [Petitioner] argues that the crime scene reconstruction testimony of Tom Bevel was unnecessary and usurped the fact finding function of the jury. As in the 2002 resentencing trial, Bevel's crime scene reconstruction testimony was used to help establish the various events involved in [Petitioner's] attack upon the deceased and the most likely sequence of those events. In Mitchell III, this Court summarized Bevel's testimony at [Petitioner's] 2002 resentencing trial:
>
>> Bevel testified extensively about what the physical evidence at the crime scene—including the bloodstain patterns, the position of Scott's body, the location of various objects, *etc.*—suggested about the "weapons" [Petitioner] used to attack Scott (including his hands, a golf club, a compass, and a coat rack) and the order in which they were used. Bevel also testified about the likelihood of some type of sexual attack upon Scott prior to her death. He noted hip bruises consistent with someone exerting pressure in this area, and also that the lack of significant blood on her clothing was inconsistent with a scenario in which the clothing was removed after her death.
>
> 2006 OK CR 20, ¶ 68, 136 P.3d at 700–01, n. 150.

---

[19] Respondent asserts that to the extent Petitioner relies upon the Sixth Amendment for relief on this claim, this portion of his claim is unexhausted. Response, pp. 68-70. However, the Court need not address Respondent's assertion because it concludes that Petitioner has not adequately presented such a claim. Petitioner's sole reference to the Sixth Amendment, namely the insertion of "VI" into a list of constitutional amendments in his closing paragraph, does not a claim make. Petition, p. 56.

[20] Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993); Kumho Tire Co., Ltd. v. Carmichael, 526 U.S. 137 (1999). Oklahoma applies the standards set forth in Daubert and Kumho to determine the admissibility of novel expert testimony. Harris v. State, 84 P.3d 731, 745 (Okla. Crim. App. 2004).

Bevel's testimony in the 2007 resentencing was substantially the same. In Mitchell III, this Court found Bevel's testimony establishing the various events involved in [Petitioner's] attack upon the deceased and the most likely sequence of those events relevant to the jury's determination regarding the "heinous, atrocious, or cruel" aggravating circumstance. Id. 2006 OK CR 20, ¶ 68, 136 P.3d at 701. We do so again.

[Petitioner] also argues Bevel's testimony was unreliable as he could not say how long the entire event lasted from start to finish, and his theory that it all happened in at most five minutes was simply impossible. The starting point for the sequence of events which included the deceased's murder was the departure of Carolyn Ross from the Pilot Center and ended with the arrival of Allen Briggs [sic] at the Center. Both Ms. Ross and Mr. Briggs [sic] gave approximate times for their departure and arrival. Bevel testified that due to these approximate times, he did not have sufficient information to say exactly how long the assault inside the Pilot Center lasted. The weight and credit to be given Bevel's testimony was within the province of the jury. See Bland v. State, 2000 OK CR 11, ¶ 29, 4 P.3d 702, 714.

Relying on 12 O.S.2001, § 2403, [Petitioner] also argues Bevel's testimony was needlessly cumulative to that of Carolyn Ross and Captain Vance Allen. Section 2403 provides that relevant evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, misleading the jury, undue delay, needless presentation of cumulative evidence, or unfair and harmful surprise. When measuring the relevancy of evidence against its prejudicial effect, the court should give the evidence its maximum reasonable probative force and its minimum reasonable prejudicial value. Mayes v. State, 1994 OK CR 44, ¶ 77, 887 P.2d 1288, 1310.

Ms. Ross and Captain Allen testified to events occurring immediately before and after [Petitioner's] assault on the deceased. Bevel's expert testimony was based in part on evidence provided by Ross and Allen. His testimony exceeded that given by Ross and Allen and his references to their testimony showed how the various accounts of that day were interconnected. Contrary to [Petitioner's] argument, the order in which the events of January 7, 1991, occurred was relevant in

the resentencing proceeding as it showed that the deceased suffered serious physical abuse prior to her death thus establishing the aggravator of "especially heinous, atrocious or cruel." [Petitioner] was not denied a fair sentencing by the admission of the crime scene reconstruction testimony.

Mitchell, 235 P.3d at 656-57. Contrary to Petitioner's contentions, the Court does not agree that the admission of Mr. Bevel's testimony denied him a fundamentally fair sentencing proceeding.

After twenty-seven years as a police officer, Mr. Bevel started his own consulting company, a significant portion of which is devoted to training others in blood stain pattern analysis and crime scene analysis and reconstruction. In the area of blood stain pattern analysis, Mr. Bevel testified that his training and education dates back to 1979. Mr. Bevel also detailed for the jury his training and education in crime reconstruction. At the time of trial, Mr. Bevel was an Associate Professor in the Master of Forensic Science program at the University of Central Oklahoma, had co-authored three editions of a textbook on blood stain pattern analysis, and had given instruction on blood stain pattern analysis to groups across the United States and abroad. Mr. Bevel had previously been recognized as an expert in state and federal courts and in foreign jurisdictions. Prior to giving his analysis of the crime scene in the present case, he explained the intricacies of his disciplines to the jury (Tr. V, 942-53).

A review of Mr. Bevel's education, experience, and overall testimony supports a finding that he was a qualified expert, and that as previously discussed in Ground III, supra, his testimony was highly relevant to the especially heinous, atrocious, or cruel aggravator. While other witnesses, like Ms. Ross and Mr. Riggs, contributed to the time line of events by testifying about their contact with Petitioner at the Center, and the medical examiner testified about the nature and extent of Ms. Scott's injuries,

Mr. Bevel's testimony covered the crime itself, i.e., the likely order of Ms. Scott's injuries (and the items used to inflict them) and the struggle Ms. Scott engaged in with Petitioner as she fought for her life. Therefore, contrary to Petitioner's assertions, Mr. Bevel's testimony was not cumulative, irrelevant, or unreliable, but germane and helpful to the jury's sentencing determination. Accordingly, the Court cannot conclude that the OCCA mishandled Petitioner's claim. Because the OCCA's denial of relief was reasonable, and because it is clear that Petitioner was not denied a fundamentally fair trial by Mr. Bevel's testimony, relief on Ground X is denied.

In Ground XI, Petitioner complains about the chain of custody relating to DNA evidence admitted in his second resentencing proceeding. The record reflects that in 1992 Mr. Wraxall, the executive director and chief forensic serologist of an independent lab in California, received evidence from Ms. Gilchrist on behalf of the Oklahoma City Police Department (Tr. IV, 866-67, 869-70, 876-77). The evidence in question is a "stain allegedly taken from the pubic hair of Ms. Scott" (Tr. IV, 877). Mr. Wraxall found semen in the stain and he extracted DNA from it. In 2002, Mr. Wraxall used updated technology to compare the extracted DNA with a known sample from Petitioner, both of which had been in his possession since 1992. Petitioner's DNA matched the extracted DNA at nine loci. Mr. Wraxall testified that the probability of finding the same match elsewhere in the population was one in nine trillion (Tr. IV, 872-76). Given the issues related to Ms. Gilchrist, see Ground I, supra, Petitioner contends that this DNA evidence should not have been admitted without additional chain of custody evidence showing how Ms. Gilchrist obtained the sample she sent to Mr. Wraxall.[21]

---

[21] Respondent argues for the application of a procedural bar to the federal aspect of Petitioner's Ground XI. Response, pp. 75-78. However, having construed Petitioner's claim as a state law evidentiary claim, its merit is properly assessed under a fundamental fairness review and the procedural bar doctrine does not apply.

In denying Petitioner relief on this claim, the OCCA acknowledged the chain of custody rule:

> The purpose of the chain of custody rule is to guard against substitution of or tampering with the evidence between the time it is found and the time it is analyzed. Alverson v. State, 1999 OK CR 21, ¶ 22, 983 P.2d 498, 509. Although the State has the burden of showing the evidence is in substantially the same condition at the time of offering as when the crime was committed, it is not necessary that all possibility of alteration be negated. Id. If there is only speculation that tampering or alteration occurred, it is proper to admit the evidence and allow any doubt to go to its weight rather than its admissibility. Id.

Mitchell, 235 P.3d at 657-58. It then found no error in the admission of the DNA evidence:

> Evidence at the resentencing established that [Petitioner] admitted to masturbating on or near the deceased's body and that the semen found on the deceased's body could have only come from ejaculate onto the deceased's body or the sheet in which her body was carried from the crime scene. [Petitioner] offers only speculation that some sort of tampering or substitution of evidence occurred prior to the time Gilchrist sent the evidence to Wraxall. Therefore, any doubts about the credibility of the evidence went to its weight not its admissibility.

Id. at 658.

The standard of review which the Court applies to this claim is one of fundamental fairness. The question, viewed through the lens of AEDPA deference, is whether the OCCA's application of its own evidentiary chain of custody rule denied Petitioner a fundamentally fair trial. It did not. On cross-examination, defense counsel questioned Mr. Wraxall about the origin of the pubic hair stain, emphasizing that it came from Ms. Gilchrist. Defense counsel also brought out issues relating to Ms. Gilchrist's reliability, and the simple fact that when Mr. Wraxall receives evidence, he does not know its integrity, i.e., how it was collected, handled, and

preserved (Tr. IV, 876-83, 887). The jury was therefore made aware of Petitioner's concerns about the evidence and could consider the same in determining what weight to give it. But even beyond this, there is Petitioner's own admission that he masturbated on Ms. Scott's body, evidence which clearly validates Mr. Wraxall's findings and supports the admission of the evidence (Tr. VI, 1154; Court's Exhibit 9, p. 1264). See Petition, pp. 12, 71 n.13 (Petitioner's acknowledgment that the DNA evidence corroborated his testimony). Given these circumstances, the admission of DNA evidence did not deny Petitioner a fundamentally fair trial and the OCCA did not act unreasonably when it found no error in the admission of the evidence. Ground XI is denied.

For the reasons set forth above, the Court finds that Petitioner is not entitled to relief on any of the general evidentiary challenges alleged in his Grounds IX, X, and XI. All of these grounds are therefore denied.

### H.     Ground XII:  Double Jeopardy.

In Ground XII, Petitioner contends that a double jeopardy violation occurred when the State was allowed to pursue the continuing threat aggravator in his second resentencing proceeding. Because the jury rejected the continuing threat aggravator in his first resentencing, Petitioner argues that jeopardy attached and the State was prevented from seeking this aggravator a second time.[22]

Petitioner raised this claim on direct appeal. Relying on its decisions in Hogan v. State, 139 P.3d 907 (Okla. Crim. App. 2006), and Harris v. State, 164 P.3d 1103 (Okla. Crim. App. 2007), the OCCA denied relief. As additional support for its denial, the OCCA also found that Petitioner's claim lacked merit because the jury

---

[22] For the same reasons stated with respect to Ground X, it is unnecessary to address Respondent's procedural bar assertion here as well. See n.19, supra.

rejected the continuing threat aggravator in his second resentencing. <u>Mitchell</u>, 235 P.3d at 662.

In <u>Hogan</u>, the defendant's first trial resulted in a death sentence supported by the jury's finding that the murder was especially heinous, atrocious, or cruel. Although alleged, this first jury did not find the continuing threat aggravator. When Hogan was retried, the State alleged not only the especially heinous, atrocious, or cruel aggravator but also the continuing threat aggravator. Like the first jury, the second jury rejected the continuing threat aggravator but returned a death sentence because the murder was especially heinous, atrocious, or cruel. Like Petitioner, Hogan "argue[d] that the failure of his first jury to unanimously find he presented a continuing threat was an effective acquittal of that aggravator which terminated jeopardy, invoked the protection of the double jeopardy clause, and prohibited the State from charging it again at his second trial." <u>Hogan</u>, 139 P.3d at 926. Applying Supreme Court authority, the <u>Hogan</u> Court denied relief as follows:

> In <u>Poland v. Arizona</u>, 476 U.S. 147, 106 S.Ct. 1749, 90 L.Ed.2d 123 (1986) the Supreme Court considered "whether the Double Jeopardy Clause bars a further capital sentencing proceeding when, on appeal from a sentence of death, the reviewing court finds the evidence insufficient to support the only aggravating factor on which the sentencing judge relied, but does not find the evidence insufficient to support the death penalty." <u>Poland</u>, 476 U.S. at 148, 106 S.Ct. at 1751. The <u>Poland</u> court affirmed the "usual" rule that a capital defendant who obtains reversal of his conviction on appeal has had his original conviction nullified and the slate wiped clean. <u>Id.</u> at 152, 106 S.Ct. at 1753. If convicted again, he may be subjected to the full range of punishment provided by law. <u>Id.</u> The clean slate rule does not apply, however, if the defendant has been acquitted because the prosecution did not prove its case for the death penalty. <u>Id.</u> A defendant is acquitted of the death penalty whenever a jury agrees or an appellate court decides that the prosecution has failed to prove its case for the death penalty. See <u>Bullington v. Missouri</u>, 451 U.S. 430, 101 S.Ct. 1852, 68 L.Ed.2d 270 (1981)(defendant sentenced to life by a capital sentencing jury has been acquitted of the death penalty and

the Double Jeopardy Clause forbids the state from seeking the death penalty on retrial in the event the defendant obtains reversal of his conviction); Arizona v. Rumsey, 467 U.S. 203, 104 S.Ct. 2305, 81 L.Ed.2d 164 (1984)(sentencer's finding, albeit erroneous, that no aggravating circumstance is present resulting in the imposition of a life sentence is an acquittal barring a second capital sentencing proceeding).

The court held in Poland that neither the sentencer nor the reviewing court had decided that the prosecution had not proved its case for the death penalty and thus acquitted the petitioners because both had found evidence of an aggravating circumstance. Poland, 476 U.S. at 154–55, 106 S.Ct. at 1754–55. The Poland court rejected the argument that a capital sentencer's failure to find a particular aggravating circumstance alleged by the prosecution constitutes an "acquittal" of that circumstance for double jeopardy purposes. Poland, 476 U.S. at 155–56, 106 S.Ct. at 1755. The court refused to "view the capital sentencing hearing as a set of minitrials on the existence of each aggravating circumstance" because aggravating circumstances are not separate penalties or offenses; rather they are the standards that guide the sentencer's choice between the alternative verdicts of death and life imprisonment. Id. at 156, 106 S.Ct. at 1755. Poland followed the usual rule, holding the State is not barred from seeking the death penalty on retrial of a defendant who has not been acquitted of the death penalty and the State may present evidence of any aggravating circumstance supported by the record.

Nothing in Sattazahn [v. Pennsylvania, 537 U.S. 101 (2003),] abrogates Poland's holding and nothing supports Hogan's argument here. Sattazahn argued that his judge-imposed life sentence in lieu of a non-finding of death by his jury was a jeopardy-terminating event. The Sattazahn majority disagreed and found that a jury's inability to reach a decision in the penalty phase of a capital trial resulting in the imposition of a statutorily mandated life sentence did not constitute an "acquittal" of the offense the Supreme Court now terms "murder plus aggravating circumstances" sufficient to bar the prosecution from seeking the death penalty again on retrial. Sattazahn, 537 U.S. at 112, 123 S.Ct. at 740. The mere imposition of a life sentence is not an acquittal of the death penalty for double jeopardy purposes. To bar the State from seeking the death penalty on retrial, there must be an affirmative decision by the

defendant's first jury not to impose a death sentence, *i.e.* an acquittal of the death penalty on the merits. Id. at 106–07, 123 S.Ct. at 737. Because Sattazahn's first jury had deadlocked without reaching a decision regarding aggravating circumstances and the trial court thereafter imposed a life sentence, Sattazahn could not establish that the jury had "acquitted" him during his first capital-sentencing proceeding. Consequently, jeopardy had not terminated; Sattazahn's successful appeal wiped the slate clean and the state was permitted to seek the death penalty upon retrial. Sattazahn, 537 U.S. at 112–13, 123 S.Ct. at 740.

Unlike Sattazahn who appealed a life sentence imposed by a judge by operation of law, Hogan appeals a death sentence imposed by a jury on a verdict of guilty on murder plus aggravating circumstances. By sentencing Hogan to death at his first trial on a finding the murder was especially heinous, atrocious, or cruel, Hogan's jury clearly did not acquit him of murder plus aggravating circumstances. Therefore, he cannot make a claim of entitlement to a life sentence on the basis of either acquittal or operation of law. In the absence of a jeopardy-terminating event entitling him to a life sentence (i.e., acquittal by jury on aggravating circumstances and imposition of life sentence or finding of insufficient evidence by appellate court of all aggravators), retrial for murder plus aggravating circumstances is not barred on double jeopardy grounds.

Contrary to his claim, Part III of the Sattazahn opinion (joined by three justices) does not support his position that his first jury effectively acquitted him of the continuing threat aggravator. Part III of that opinion discusses the application of Apprendi v. New Jersey[, 530 U.S. 466 (2000),] and Ring v. Arizona[, 536 U.S. 584 (2002),] in the context of capital sentencing double jeopardy claims. Because aggravating circumstances operate as the functional equivalent of an element of a greater offense, murder is a distinct lesser included offense of murder plus one or more aggravating circumstances. Murder exposes a defendant to a maximum sentence of life imprisonment; murder plus one or more aggravators increases the maximum sentence to death. The Sixth Amendment requires that a jury, not a judge, find the existence of any aggravating circumstances beyond a reasonable doubt. In Part III of Sattazahn, a plurality of the court agreed:

In the post-Ring world, the Double Jeopardy Clause can, and must, apply to some capital-sentencing proceedings consistent with the text of the Fifth Amendment. If a jury unanimously concludes that a State has failed to meet its burden of proving the existence of one or more aggravating circumstances, double-jeopardy protections attach to that "acquittal" on the offense of "murder plus aggravating circumstance(s)." Thus, [Arizona v.] Rumsey [467 U.S. 203, 104 S.Ct. 2305, 81 L.Ed.2d 164 (1984)] was correct to focus on whether a factfinder had made findings that constituted an "acquittal" of the aggravating circumstances; but the reason that issue was central is not that a capital-sentencing proceeding is "comparable to a trial," . . . but rather that "murder plus one or more aggravating circumstances" is a separate offense from "murder" *simpliciter*.

Sattazahn, 537 U.S. at 112, 123 S.Ct. at 740.

Hogan's first jury found that the murder was especially heinous, atrocious, or cruel and convicted him of murder plus aggravating circumstance(s). Even were we to treat each aggravator as a separate offense as Hogan desires rather than distinguishing as separate offenses murder simpliciter and murder plus aggravating circumstance(s), the only thing we know about Hogan's first jury is that it did not unanimously find that the continuing threat aggravator existed beyond a reasonable doubt. This is not the same as a unanimous finding that the aggravator does not exist at all; some jurors may have found it while others did not. Jeopardy does not attach and bar retrial in that situation. See Sattazahn, 537 U.S. at 109, 123 S.Ct. at 738 (stating a retrial following a hung jury normally does not violate the Double Jeopardy Clause).

For that reason, this case does not implicate the concerns of protecting the finality of acquittals present in Bullington and Rumsey. There is no reason to shield a defendant in Hogan's position from further litigation; further litigation is the only hope he has. Poland, 476 U.S. at 156, 106 S.Ct. at 1756. Neither does Hogan's case present the Hobson's choice discussed by the Sattazahn dissent. Sattazahn, 537 U.S. at 126, 123 S.Ct at 748 (Ginsburg, J., dissenting)(noting that a defendant in Sattazahn's position must relinquish either his right to file a potentially

meritorious appeal, or his state-granted entitlement to avoid the death penalty). When Hogan appealed and succeeded in overturning his murder conviction and vacating his death sentence, the slate was wiped clean. The State was not barred from retrying Hogan on murder plus aggravating circumstances and presenting evidence to support the continuing threat aggravator.

Hogan, 139 P.3d at 926-30 (footnotes omitted).

As repeatedly stated herein, in order for Petitioner to obtain relief for any of his claims he must show that the OCCA rendered a decision that is contrary to or an unreasonable application of Supreme Court law. In rejecting Petitioner's double jeopardy claim, the OCCA relied on Hogan wherein it recited and applied relevant Supreme Court authority to deny a claim which is identical to Petitioner's, and the Court finds no fault with the OCCA's reasoned analysis. See Hanson v. Sherrod, No. 10-CV-0113-CVE-TLW, 2013 WL 3307111, at *22-24 (N.D. Okla. July 1, 2013) (concluding that the OCCA did not unreasonably apply Poland based on the reasoning employed in Hogan). Accordingly, no relief is warranted on Petitioner's Ground XII.

## I. Ground XIV: Jury Question.

In Ground XIV, Petitioner asserts that he is entitled to a new trial because the jury did not have all of the information it needed to make a reliable sentencing determination. Petitioner's claim is based on a question the jury sent out during deliberations. The actual jury note is not contained in the record, and although the trial transcript does not reflect the exact question asked, it is clear from the in camera discussion that the jury was inquiring about the nature of Petitioner's murder conviction, i.e., whether it was premeditated. *At the urging of Petitioner's counsel*, the trial court did not answer the jury's question. The jurors were told that they had all of the law and evidence it needed to return a verdict (Tr. IX, 1652-54). Petitioner now contends that because the jury questioned his mental state and because "[t]he jury

was not given an instruction allowing them to take that concern into consideration while weighing aggravating and mitigating circumstances," at least one member of the jury questioned his underlying guilt and therefore both his conviction and sentence must be vacated. Petition, pp. 70-71.

In denying Petitioner relief on this claim, the OCCA held as follows:

> In Proposition XII, [Petitioner] contends the trial court erred in failing to instruct the jury to give consideration to any questions it might have concerning [his] guilt of first degree murder. His claim is based on a note received from the jury during deliberations asking whether [he] had been convicted of premeditated murder. [Petitioner] asserts the note indicates that at least one juror harbored some doubt regarding the murder conviction. We review only for plain error as this objection is being raised for the first time on appeal. Bernay v. State, 1999 OK CR 37, ¶ 49, 989 P.2d 998, 1012.

> Resentencing proceedings should not be viewed as a second chance at revisiting the issue of guilt. Rojem v. State, 2006 OK CR 7, ¶ 56, 130 P.3d 287, 299. Evidence relating to residual doubt is "not relevant to the defendant's character, record, or any circumstance of the offense." Id. quoting Bernay, 1999 OK CR 37, ¶ 50, 989 P.2d at 1012. To tell the jury as defense counsel did in opening statement that [Petitioner] had been convicted of first degree murder, yet later tell them to consider residual doubt as mitigation evidence would be inconsistent and confusing. Rojem, 2006 OK CR 7, ¶ 55, 130 P.3d at 298. We find no plain error in the trial court's failure to instruct the jury on residual doubt.

Mitchell, 235 P.3d at 660. Petitioner has not met his burden of showing that this decision is contrary to or unreasonable application of Supreme Court law.

Petitioner's guilt was determined by a jury in 1992, and his resentencing proceedings did not open an avenue for its reconsideration. Throughout the second resentencing, the jury was continually advised and reminded that Petitioner had already been convicted of first degree murder and that its only job was to determine

his sentence (O.R. VII, 1346; Tr. I, 56-57, 59; Tr. II, 174, 358-59, 361-62; Tr. III, 529, 641; Tr. IX, 1570-71). During voir dire particularly, the jury was told in no uncertain terms that Petitioner had committed an intentional act and that he had absolutely no defense to it. Among other admissions, defense counsel told the jury that "there was no legal justification"; "it wasn't an accident"; 'it wasn't self-defense'; "[Petitioner] wasn't insane"; and "he wasn't drunk" (Tr. II, 395; Tr. III, 518, 521). Given these circumstances, which demonstrate a clear explanation of Petitioner's crime and the jury's sole task of determining punishment, the reason for the jury's question is unclear.[23] However, in response to Petitioner's claim that the question was an indication that at least one juror "harbored some doubt regarding some aspect of [his] murder conviction," the Court cannot fault the OCCA for denying Petitioner relief because residual doubt was not relevant to the jury's sentencing determination. See Brief of Appellant, Case No. D-2008-57, p. 61.

The Supreme Court has "never held that capital defendants have an Eighth Amendment right to present 'residual doubt' evidence at sentencing." Abdul-Kabir v. Quarterman, 550 U.S. 233, 250-51 (2007) (citing Oregon v. Guzek, 546 U.S. 517, 523-27 (2006)). In the Guzek opinion, the Supreme Court discussed its Eighth Amendment case law, giving particular attention to its holding in Lockett v. Ohio, 438 U.S. 586 (1978). Guzek, 546 U.S. at 523-24. In Lockett, the Supreme Court held that "the Eighth and Fourteenth Amendments require that the sentencer, in all but the rarest kind of capital case, not be precluded from considering, *as a mitigating factor*, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death." Lockett, 438 F.3d at 604 (footnotes omitted). However, despite this broad statement in Lockett

---

[23] The trial court even questioned "the idiot . . . who wrote the question" (Tr. IX, 1654).

governing the admission of mitigating evidence, the Supreme Court in Guzek found that it had never construed the Eighth Amendment as encompassing the right to present evidence of residual doubt. Guzek, 546 U.S. at 523, 525. Because the OCCA's decision is in line with both Abdul-Kabir and Guzek, Petitioner cannot rely upon them for relief.

Petitioner's reliance on the Supreme Court's decisions in Kennedy v. Louisiana, 554 U.S. 407 (2008), Spaziano v. Florida, 468 U.S. 447 (1984), *overruled on other grounds by* Hurst v. Florida, 577 U.S.___, 136 S. Ct. 616 (2016), and Woodson v. North Carolina, 428 U.S. 280 (1976), are not helpful to him either because he has not shown that the OCCA's decision is in conflict with these holdings. In Kennedy, 554 U.S. at 413, the Supreme Court found that it was constitutionally impermissible to sentence a defendant to death for raping a child "where the crime did not result, and was not intended to result, in death of the victim." Kennedy is clearly inapplicable to the present case because Ms. Scott was murdered, and Petitioner's first jury found beyond a reasonable doubt that her murder was intended. As for Spaziano, Petitioner cites it for the proposition that a capital sentencing determination requires the jury to be informed "on the facts and circumstances of the individual and his crime." Spaziano, 468 U.S. at 460 n.7. However, in his second resentencing proceeding, the State presented evidence which informed the jury of the circumstances of Petitioner's crime and why Petitioner was deserving of the death penalty, and likewise Petitioner was given the opportunity to challenge this evidence through cross-examination and to present his case for mitigation. And finally, Woodson, 428 U.S. at 305, stands for the general principal that capital punishment proceedings require heightened reliability, but because this general principal is inherently subsumed in the Supreme Court's decision in Guzek, the Supreme Court case which directly addresses the

specific issue raised by Petitioner, the Court finds that <u>Woodson</u> offers Petitioner no greater protection.

In summary, for the reasons set forth above, the Court finds that Petitioner's Ground XIV is without merit. Because Petitioner has not shown that the OCCA's decision is contrary to or an unreasonable application of Supreme Court law, relief is denied.

**J.      Ground XV:  Victim Impact Testimony.**

In Ground XV, Petitioner raises three errors with respect to the victim impact testimony presented at his second resentencing proceeding. All three of these claims were presented to the OCCA and denied on the merits. <u>Mitchell</u>, 235 P.3d at 660-61; <u>Mitchell</u>, 136 P.3d at 703-04. Therefore, in order to prevail on any of them, Petitioner must show that the OCCA's decision is contrary to or an unreasonable application of Supreme Court law. Because Petitioner has not made this showing, the Court finds that relief must be denied.

In his first claim, Petitioner asserts that the victim impact evidence presented through Ms. Scott's parents and her brother violated <u>Payne v. Tennessee</u>, 501 U.S. 808 (1991). He argues that <u>Payne</u> permits only a quick glimpse of the victim's life and that testimony which  focuses "solely on the emotional impact of the family's loss" is improper. Petition, p. 73.

In <u>Payne,</u> the Supreme Court held that the Eighth Amendment does not erect a per se bar to the admission of victim impact evidence. "A State may legitimately conclude that evidence about the victim and about the impact of the murder on the victim's family is relevant to the jury's decision as to whether or not the death penalty should be imposed." <u>Payne</u>, 501 U.S. at 827. While this evidence does not violate the Eighth Amendment, the Court in <u>Payne</u> acknowledged that a Fourteenth Amendment

violation may be found where the evidence introduced "is so unduly prejudicial that it renders the trial fundamentally unfair." Id. at 825.

In denying Petitioner relief on this claim, the OCCA held as follows:

> Three victim impact witnesses testified at the re-sentencing—the deceased's father, mother, and brother. This testimony comprised only eleven pages out of the 1,664 pages of transcript. The victim impact statements appear to be substantially the same as those given in the first re-sentencing trial. Cognizant of our review of the evidence presented in the first re-sentencing proceeding, the trial court reviewed the statements *in camera* and significantly pared them down. Having thoroughly reviewed the victim impact statements given in this case, we find they did not focus too much on the emotional aspects of the decedent's death or her family's life prior to her death. Therefore, the evidence did not violate due process or deprive [Petitioner] of a fair sentencing proceeding.

Mitchell, 235 P.3d at 660. Because the OCCA's analysis is reasonable, and because it stands a far distance from the extreme malfunctions the AEDPA is meant to correct, no relief is warranted for this claim. Richter, 562 U.S. at 102.

Petitioner's next claim is that "[v]ictim impact evidence acts as a 'super-aggravator' which negates or impermissibly diminishes the narrowing function that aggravating circumstances are constitutionally required to provide under the Eighth and Fourteenth Amendments." Petition, p. 73 (citing Lockett). The OCCA rejected this argument, and given the Supreme Court's decision in Payne, Petitioner cannot show that its determination is unreasonable. Mitchell, 235 P.3d at 660; Mitchell, 136 P.3d at 703 & n.168 (citing Cargle v. State, 909 P.2d 806, 828 n.15 (Okla. Crim. App. 1995)). It is clear that Petitioner's argument here is for a blanket exclusion. By employing the term "super-aggravator," Petitioner argues that victim impact evidence should never be allowed because it functions outside of the jury's assessment and weighing of the aggravating and mitigating circumstances, "tipping the scales in favor

of death." Petition, p. 74. Without a doubt, <u>Payne</u> forecloses Petitioner's argument. As long as victim impact evidence operates within the parameters of the Due Process Clause and does not unduly infringe upon a defendant's right to a fundamentally fair trial, the State is allowed to introduce the evidence and the jury is allowed to consider it as it determines an appropriate sentence. <u>Payne</u>, 501 U.S. at 824-25, 827.

Petitioner's final challenge is to the instruction given to the jury regarding its consideration of the victim impact evidence that was presented. Petitioner takes issue with the following language: "It [victim impact evidence] is intended to remind you as the sentencer that just as the defendant should be considered as an individual, so too the victims are individuals whose death may represent a unique loss to society and the family" (O.R. VII, 1367). Petitioner's problem with this language is its reference to society's loss. Although Petitioner acknowledges that it reflects the verbiage used in <u>Payne</u>, Petitioner contends that it exceeds what is permitted by Oklahoma statute. Petition, pp. 74-75.

By acknowledging that the instruction comports with <u>Payne</u>, Petitioner has undercut his request for relief. At most, Petitioner has presented a claim of state law error; however, this Court is not empowered to order relief for violations of state law. <u>Hancock v. Trammell</u>, 798 F.3d 1002, 1034 (10th Cir. 2015) (citing <u>Estelle v. McGuire</u>, 502 U.S. 62, 67 (1991), for the proposition that "[f]ederal courts cannot grant habeas relief based on a state court's erroneous application of state law"). In addition, the Court is equally mindful that it is bound by the OCCA's interpretation of its own law. <u>House v. Hatch</u>, 527 F.3d 1010, 1028 (10th Cir. 2008). In denying Petitioner relief, the OCCA specifically found that the society language contained in the victim impact instruction was not only consistent with <u>Payne</u>, but permissible under Oklahoma law.

Oklahoma law does strictly limit *who* can present victim impact evidence, *i.e.*, the victim *or* members of the victim's immediate family *or* a representative of the victim or the family. Oklahoma law also constrains the content of such testimony, through our statutes and our caselaw interpreting these statutes and relevant U.S. Supreme Court decisions. Yet nothing within this governing authority prohibits evidence about how the victim's death represents a loss to society, so long as this evidence is otherwise appropriate. We recognize, as did the Payne Court, that a capital sentencing should not be focused upon the comparative "worth" to society of the victim whose life was taken. Nevertheless, we also recognize that providing even a brief "glimpse" of the life that the defendant extinguished will often involve evidence about what kind of person the victim was–including evidence suggesting the victim's unique role in and contributions to society. Similarly, a family member's testimony about the impact of a victim's death on that individual may also tend to suggest the victim's special role in society generally.

While such evidence must be carefully evaluated under our existing standards, victim impact evidence suggesting that a particular victim was a uniquely valuable member of his or her community and our society is not *per se* inadmissible in a capital sentencing proceeding. Furthermore, we conclude that the single reference to the "loss to society" within our uniform jury instruction is constitutional and is also appropriate under Oklahoma law.

Mitchell, 136 P.3d at 703-04 (footnotes omitted). Accordingly, this claim is denied as well.

For the reasons set forth above, the Court denies relief on Petitioner's Ground XV. Because Petitioner has failed to show that the OCCA rendered a decision which is contrary to or an unreasonable application of Supreme Court law, relief under the AEDPA is foreclosed.

### K.     Ground XVI:  Prosecutorial Misconduct.

In Ground XVI, Petitioner alleges three instances of prosecutorial misconduct. Because the OCCA reviewed this claim on the merits, Petitioner's ability to obtain

relief is contingent upon his showing that the OCCA's decision is contrary to or an unreasonable application of the due process standard of review employed by the Supreme Court to such claims. The Court concludes that he has not met his burden of proof.

"Prosecutors are prohibited from violating fundamental principles of fairness, which are basic requirements of Due Process." Hanson v. Sherrod, 797 F.3d 810, 843 (10th Cir. 2015). Therefore, when a petitioner alleges prosecutorial misconduct, the question is whether the prosecutor's actions or remarks "so infected the trial with unfairness as to make the resulting conviction a denial of due process." Donnelly v. DeChristoforo, 416 U.S. 637, 643 (1974). Evaluating the alleged misconduct in light of the entire proceeding, the reviewing court must determine "whether the jury was able to fairly judge the evidence in light of the prosecutors' conduct." Bland v. Sirmons, 459 F.3d 999, 1024 (10th Cir. 2006). In denying Petitioner relief, the OCCA applied this due process standard. Mitchell, 235 P.3d at 661.

Petitioner's first complaint concerns the prosecutor's continual references to justice. Petitioner argues that the prosecutor's comments equated justice with a death sentence and expressed "her personal opinion that death was the only just verdict." Petition, p. 76. The majority of Petitioner's complaint focuses on voir dire and the prosecutor's questions to the prospective jurors about whether they believed that the purpose of the trial was to search for the truth and whether the end result should be justice. Petitioner makes additional reference to a line of argument in the prosecutor's second closing argument wherein the prosecutor reminded the jurors of their answers to these questions, followed by her submission that based on the crime committed, death was the appropriate sentence. Petition, pp. 76-77.

Because there was no defense objection to any of these comments, the OCCA reviewed this claim for plain error. It then denied relief as follows:

> A review of the comments made in *voir dire* does not support [Petitioner's] argument. None of the comments equate justice with the death penalty or express the prosecutor's personal opinion on the death penalty. At most, the prosecutor got the prospective jurors to agree that the trial should be a search for the truth and that the result should be justice. Other comments suggested that justice might be a sentence other than death. We find no plain error in the prosecutor's *voir dire* comments.
>
> As for closing arguments, the prosecutor's arguments were based on the evidence and focused on the jurors' duty to apply the law and the evidence and return the appropriate verdict. The comments did not convey the message that the jury had to vote for the death penalty or that they were to decide the case based on emotional reaction. We find no plain error.

Mitchell, 235 P.3d at 661 (citation omitted). Having thoroughly reviewed the comments as well, the Court concludes that the OCCA's assessment of the claim is both reasonable and accurate. In none of the comments did the prosecutor cross the equity line and infringe on Petitioner's ability to receive a fair trial.

Next, Petitioner complains about references to Ms. Scott being raped. As a result of the appeal of his first resentencing proceeding, the State was only permitted to use attempted rape (not rape) as the predicate crime for the avoid arrest aggravator in his second resentencing. Mitchell, 136 P.3d at 677-88. Accordingly, Petitioner argues that error occurred (1) when his prior testimony was admitted (because it included his denial that he did not rape or sodomize Ms. Scott) and (2) when the prosecutor misspoke twice in closing argument and used the term rape instead of attempted rape.

In denying Petitioner relief on this claim, the OCCA found that Petitioner was not entitled to relief because he had not shown prejudice. The OCCA reasoned that because the jury did not find the avoid arrest aggravator and because the references

did not impact the jury's finding of the especially heinous, atrocious, or cruel aggravator, Petitioner was not denied a fair trial. Mitchell, 235 P.3d at 662. Here again, the Court finds that the OCCA's conclusion is reasonable. The fact that the jury did not find the avoid arrest aggravator is tantamount to the lack of prejudice, and Petitioner offers no argument challenging this finding.

Finally, Petitioner imputes misconduct to the prosecution based on the amount of evidence it introduced and how it was presented to the jury. The OCCA denied relief on this claim with reference to its rejection of Petitioner's other claims challenging the admission of evidence, concluding that "the presentation of the evidence and arguments to the jury were not indicative of prosecutorial misconduct." Mitchell, 235 P.3d at 662. Petitioner has not shown how this finding is unreasonable. In this regard, one must not forget that a prosecutor is still an advocate who is permitted to "prosecute with earnestness and vigor" and to argue the case from the State's point of view. Berger v. United States, 295 U.S. 78, 88 (1935). The prosecution did so in the present case, and because the OCCA found no error in the admission of evidence, a claim of prosecutorial misconduct cannot stand.

In conclusion, the Court finds that Petitioner is not entitled to relief on his Ground XVI because he has not shown that the OCCA unreasonably denied his allegations of prosecutorial misconduct. Ground XVI is denied.

### L. Ground XVII: Especially Heinous, Atrocious, or Cruel Aggravator.

Petitioner's Ground XVII is a challenge to the especially heinous, atrocious, or cruel aggravator. Petitioner's first contention is that the aggravator is unconstitutional. He also argues that once improperly admitted evidence is removed from consideration, there is insufficient evidence to support it. Petitioner presented these claims to the OCCA on direct appeal. The OCCA rejected Petitioner's

challenges to the constitutionality of the aggravator and the supporting evidence and found sufficient evidence to support it. Mitchell, 235 P.3d at 662-64. Because these determinations are reasonable, Petitioner's Ground XVII must be denied.

Regarding Petitioner's challenge to the constitutionality of the aggravator, Petitioner has not shown that the OCCA unreasonably denied this claim. Mitchell, 235 P.3d at 662. The Tenth Circuit has repeatedly rejected similar challenges. Wilson, 536 F.3d at 1108 ("The Tenth Circuit has routinely upheld the constitutionality of the heinous, atrocious, or cruel aggravator so long as it includes the 'torture or serious physical abuse' limitation."); Miller v. Mullin, 354 F.3d 1288, 1300 (10th Cir. 2004) (listing several cases in which the Tenth Circuit has upheld Oklahoma's heinous, atrocious, or cruel aggravator since it was found unconstitutionally vague in Maynard v. Cartwright, 486 U.S. 356 (1988)); Workman v. Mullin, 342 F.3d 1100, 1115-16 (10th Cir. 2003) ("We have specifically found Oklahoma's new formulation to be constitutional since this limiting language was enacted."); Medlock v. Ward, 200 F.3d 1314, 1321 (10th Cir. 2000) ("We have held that the 'heinous, atrocious, or cruel' aggravating circumstance as narrowed by the Oklahoma courts after Maynard to require torture or serious physical abuse characterized by conscious suffering can provide a principled narrowing of the class of those eligible for death.").

As for the allegedly improper evidence supporting the aggravator, Petitioner refers to the evidentiary claims he presents in his Grounds IX and X, supra. However, the OCCA found no error in the admission of this evidence and this Court has likewise denied relief.

What remains then is Petitioner's attack on the sufficiency of the evidence supporting the aggravator. When reviewing the sufficiency of the evidence supporting an aggravating circumstance, the OCCA applies the standard of review set forth in

Jackson v. Virginia, 443 U.S. 307, 319 (1979). Thus, the OCCA "reviews the evidence in the light most favorable to the State to determine if any rational trier of fact could have found the aggravating circumstance beyond a reasonable doubt." Mitchell, 235 P.3d at 663-64. Jackson applies on habeas review as well. Lewis v. Jeffers, 497 U.S. 764, 781 (1990). "Like findings of fact, state court findings of aggravating circumstances often require a sentencer to 'resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts.'" Id. at 782 (quoting Jackson, 443 U.S. at 319). Thus, the Court "'must accept the jury's determination as long as it is within the bounds of reason.'" Lockett v. Trammel [sic], 711 F.3d 1218, 1243 (10th Cir. 2013) (quoting Boltz v. Mullin, 415 F.3d 1215, 1232 (10th Cir. 2005)). In addition to the deference afforded a jury's verdict, the AEDPA adds another layer of deference to the Court's review of a sufficiency claim. See Hooks v. Workman, 689 F.3d 1148, 1166 (10th Cir. 2012) ("We call this standard of review 'deference squared.'") (citation omitted). When reviewing the evidentiary sufficiency of an aggravating circumstance under Jackson, the Court looks to Oklahoma substantive law to determine its defined application. Hamilton v. Mullin, 436 F.3d 1181, 1194 (10th Cir. 2006).

In determining Petitioner's claim, the OCCA set forth the following standard for the aggravator:

> To prove the "especially heinous, atrocious or cruel" aggravator, the State must show that the murder of the victim was preceded by torture or serious physical abuse, which may include the infliction of either great physical anguish or extreme mental cruelty. After making the above determination, the attitude of the killer and the pitiless nature of the crime can also be considered.

Mitchell, 235 P.3d at 664 (citation omitted). It then found the aggravator satisfied by the following evidence:

The decedent was first assaulted by [Petitioner] in the Center's library and in a desperate attempt to get away from him, ran for the innermost room of the Center's staff office where she could lock the door behind her and phone for help. However, before she could secure herself behind the locked door, [Petitioner] forced his way into the office and a violent struggle ensued. The decedent's clothing was removed and she was beaten by [Petitioner] using his fist, a school compass, a golf club and a wooden coat rack. The decedent moved and attempted to defend herself throughout the attack until [Petitioner] inflicted the final blow to her head with the coat rack. This evidence clearly shows the decedent's conscious physical suffering as a result of [Petitioner's] repeated physical assaults to her body. Further, her great mental anguish is evident as she surely realized her options for getting past [Petitioner] and out of the office to safety were dwindling.

Considering the unprovoked manner of the killing in this case, the conscious suffering of the decedent, both physically and mentally, and the attitude of the killer as evidenced by [Petitioner's] attacks upon a victim whom he clearly overpowered and who did not have the means to adequately defend herself, the jury's finding of the "heinous, atrocious or cruel" aggravator was supported by sufficient evidence.

Id. Petitioner simply has no argument that this finding is unreasonable. Even beyond a finding that the OCCA's determination is reasonable under the AEDPA's double deference standard, the evidence that Ms. Scott's murder was especially heinous, atrocious, or cruel is so clear and undisputed that this Court has no doubt that the jury's finding of this aggravating circumstance is supported by the constitutionally sufficient evidence. Ground XVII is denied.

## M.  Ground XVIII:  Jury Instructions.

Petitioner's Ground XVIII presents three challenges to the jury instructions.[24] For the following reasons, none entitle Petitioner to habeas relief.

---

[24] In an effort to "preserve them all," Petitioner puts forth a laundry list of other issues at the close of this ground for relief.  Petition, pp. 83-84.  These claims are hereby denied without consideration of their merit, because they are not, in any sense, meaningfully articulated.

"A habeas petitioner who seeks to overturn his conviction based on a claim of error in the jury instructions faces a significant burden." Ellis v. Hargett, 302 F.3d 1182, 1186 (10th Cir. 2002). "Unless the constitution mandates a jury instruction be given, a habeas petitioner must show that, in the context of the entire trial, the error in the instruction was so fundamentally unfair as to deny the petitioner due process." Tiger v. Workman, 445 F.3d 1265, 1267 (10th Cir. 2006).

> It is well established that a criminal defendant has a due process right to a fair trial. E.g., Drope v. Missouri, 420 U.S. 162, 172, 95 S.Ct. 896, 43 L.Ed.2d 103 (1975). Further, the Supreme Court has acknowledged that an instructional error can, under certain circumstances, result in a violation of a defendant's right to a fair trial. See Henderson v. Kibbe, 431 U.S. 145, 154, 97 S.Ct. 1730, 52 L.Ed.2d 203 (1977); Cupp v. Naughten, 414 U.S. 141, 147, 94 S.Ct. 396, 38 L.Ed.2d 368 (1973). Importantly, however, the Court has stated that "[t]he burden of demonstrating that an erroneous instruction was so prejudicial that it will support a collateral attack on the constitutional validity of a state court's judgment is even greater than the showing required to establish plain error on direct appeal." Henderson, 431 U.S. at 154, 97 S.Ct. 1730. "The question in such a collateral proceeding," the Court has stated, "is whether the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process," and "not merely whether the instruction is undesirable, erroneous, or even universally condemned . . . ." Id. (internal quotation marks and citations omitted).

Cummings v. Sirmons, 506 F.3d 1211, 1240 (10th Cir. 2007).

Petitioner's first complaint is that although the jury was instructed that it had to consider the aggravating circumstances before it could impose the death penalty, the instructions did not impose the same mandatory consideration of the mitigating circumstances. Thus, Petitioner asserts that "[t]he permissive language of the uniform jury instructions improperly allowed the jury the option of ignoring mitigating circumstances altogether." Petition, p. 82.

In denying Petitioner relief, the OCCA found that the quoted language upon which Petitioner based this claim was not contained in the instructions given to the jury. Therefore, Petitioner's assertion that error occurred when the jury was instructed that mitigating evidence "'*may be* considered'"[25] was completely baseless. <u>Mitchell</u>, 235 P.3d at 664 (emphasis added). This holding is of course reasonable, which explains why Petitioner has corrected[26] the quoted language to reflect what the jury was actually told in his second resentencing proceeding. Petition, p. 82. However, with this correction, the very substance of the claim evaporates. Petitioner's reference is now to a general instruction defining what mitigating circumstances are. There is no language in this instruction that gives the jury the option of not considering his mitigation evidence. In fact, it even states that it is up to the jury to determine what circumstances are mitigating and that mitigating circumstances do not have to meet the reasonable doubt standard before being considered (O.R. VII, 1359). In other instructions, the jury was also advised (1) of the circumstances that Petitioner believed were mitigating, while being told that it was not confined to this list but could consider any other circumstances it deemed mitigating; and (2) that before returning a death sentence, it must first find that the aggravating circumstances outweigh the mitigating ones, but that even so, that it was not required to impose a sentence of death (O.R. VII, 1360-64). Reviewing the instructions as a whole, it is clear that they did not employ the permissive language Petitioner objects to and the instructions did not hinder the jury's consideration of Petitioner's mitigating evidence.

---

[25] The record reflects that this language was a part of the instructions to the jury in Petitioner's first trial, but not in the second resentencing proceeding (O.R. I, 71).

[26] Respondent asserts that this correction equates to a new claim which is unexhausted and subject to a procedural bar; however, he also acknowledges that the new claim may be dismissed on the merits despite the lack of exhaustion. Response, p. 112. Because the claim is clearly without merit, the Court finds that dismissal on the merits is the easier course.

Petitioner's next complaint is with the uniform instruction OUJI-CR (2d) 4-76, which was given to his jury and provides in pertinent part:

> Should you unanimously find that one or more aggravating circumstances existed beyond a reasonable doubt, you are authorized to consider imposing a sentence of death.
>
> If you do not unanimously find beyond a reasonable doubt that one or more of the aggravating circumstances existed, you are prohibited from considering the penalty of death. In that event, the sentence must be imprisonment for life without the possibility of parole or imprisonment for life with the possibility of parole.

(O.R. VII, 1355). Petitioner asserts that this instruction is erroneous because it implies that the jury could only give a life sentence if it did not find any aggravating circumstances. Petition, p. 82. On direct appeal, the OCCA found no merit to the claim. Mitchell, 235 P.3d at 664 (citing Bryson v. State, 876 P.2d 240 (Okla. Crim. App. 1994). In light of Tenth Circuit authority rejecting this very claim, the Court finds that Petitioner has not shown that the OCCA's denial of relief is unreasonable. Fox v. Ward, 200 F.3d 1286, 1300-01 (10th Cir. 2000); Bryson v. Ward, 187 F.3d 1193, 1206-07 (10th Cir. 1999); Duvall v. Reynolds, 139 F.3d 768, 789-91 (10th Cir. 1998).

Petitioner's third challenge to the instructions is to another uniform instruction, OUJI-CR (2d) 4-80, which was given to his jury. This instruction states as follows:

> If you unanimously find that one or more of the aggravating circumstances existed beyond a reasonable doubt, the death penalty shall not be imposed unless you also unanimously find that any such aggravating circumstance or circumstances outweigh the finding of one or more mitigating circumstances. Even if you find that the aggravating circumstances outweigh the mitigating circumstances, you may impose a sentence of imprisonment for life with the possibility of parole or imprisonment for life without the possibility of parole.

(O.R. VII, 1364). Petitioner contends that this instruction is erroneous because it conflicts with a state statute, Okla. Stat. tit. 21, § 701.11, and because it permits the imposition of a death sentence upon a simple weighing of the aggravating and mitigating circumstances. Petition, p. 83. The OCCA rejected this claim on the merits and Petitioner has failed to show that its rejection was unreasonable. Mitchell, 235 P.3d at 664.

In Kansas v. Marsh, 548 U.S. 163, 173-74 (2006), the Supreme Court found that in order for a state capital sentencing scheme to be deemed constitutional, it must meet only two qualifications. It "must 1) rationally narrow the class of death-eligible defendants; and (2) permit a jury to render a reasoned, individualized sentencing determination based on a death-eligible defendant's record, personal characteristics, and the circumstances of his crime." Id. If these two qualifications are met, Supreme Court precedent makes it clear "that a State enjoys a range of discretion in imposing the death penalty, including the manner in which aggravating and mitigating circumstances are to be weighed." Id. at 174. The Supreme Court has "'never held that a specific method for balancing mitigating and aggravating factors in a capital sentencing proceeding is constitutionally required.'" Id. at 175 (quoting Franklin v. Lynaugh, 487 U.S. 164, 179 (1988)).

In accordance with Marsh, the Court finds that Petitioner has not shown that OUJI-CR (2d) 4-80 is constitutionally infirm. Oklahoma is acting within the discretion afforded it by the Supreme Court. In addition, the Court is unpersuaded by Petitioner's argument that the instruction is in conflict with Section 701.11. The OCCA has specifically rejected Petitioner's argument, and as a matter of state law, the Court is bound by its interpretation. House, 527 F.3d at 1028; Fields v. State, 923

P.2d 624, 638 (Okla. Crim. App. 1996); Allen v. State, 871 P.2d 79, 101 (Okla. Crim. App. 1994).[27]

For the foregoing reasons, the Court finds that Petitioner has failed to establish his entitlement to relief based on alleged faulty instructions. Accordingly, Petitioner's Ground XVIII is denied.

### N.     Ground XX:  Aggravating Circumstances.

In Ground XX, Petitioner asserts that Jones v. United States, 526 U.S. 227 (1999), Apprendi v. New Jersey, 530 U.S. 466 (2000), and Ring v. Arizona, 536 U.S. 584 (2002), require Oklahoma capital juries to find beyond a reasonable doubt that the aggravating circumstances outweigh the mitigating circumstances.  Petitioner raised this claim on direct appeal but was denied relief.  Mitchell, 235 P.3d at 665.  In light of the numerous circuit and district court opinions rejecting this very claim, the Court finds that Petitioner has not shown that the OCCA's rejection of this claim is contrary to or an unreasonable application of Supreme Court law.  Lockett, 711 F.3d at 1252-55; Matthews v. Workman, 577 F.3d 1175, 1195 (10th Cir. 2009); Lay v. Trammell, No. 08-CV-617-TCK-PJC, 2015 WL 5838853, at *54-56 (N.D. Okla. Oct. 7, 2015); Rojem v. Trammell, No. CIV-10-172-M, 2014 WL 4925512, at *18 (W.D. Okla. Sept. 30, 2014); Smith v. Trammell, No. CIV-09-293-D, 2014 WL 4627225, at *50 (W.D. Okla. Sept. 16, 2014);  Ryder ex rel. Ryder v. Trammell, No. CIV-05-0024-JHP-KEW, 2013 WL 5603851, at *35 (E.D. Okla. Oct. 11, 2013); Fitzgerald v. Trammell, No. 03-CV-531-GKF-TLW, 2013 WL 5537387, at *59 (N.D. Okla. Oct. 7, 2013); Jackson v. Workman, No. 08-CV-204-JHP-FHM, 2013 WL 4521143, at *27 (N.D. Okla. Aug. 26, 2013);  Cole v. Workman, No. 08-CV-328-CVE-PJC, 2011 WL

---

[27] In denying Petitioner relief, the OCCA noted that Petitioner, who in his brief on appeal had acknowledged the holdings of Fields and Allen, was in effect asking the Court to reconsider the issue.  Mitchell, 235 P.3d at 664.  See Brief of Appellant, Case No. D-2008-57, p. 78 & n.43.

3862143, at *51-52 (N.D. Okla. Sept. 1, 2011); DeRosa v. Workman, No. CIV-05-213-JHP, 2010 WL 3894065, at *32-33 (E.D. Okla. Sept. 27, 2010); Murphy v. Sirmons, 497 F. Supp. 2d 1257, 1277-78 (E.D. Okla. 2007). Relief is therefore denied.

### O. Ground XXI: Cumulative Error.

In his final ground, Petitioner asserts that he is entitled to relief based on a cumulative error theory. Petitioner unsuccessfully raised a cumulative error claim on direct appeal, which the OCCA addressed as follows:

> We have reviewed each of [Petitioner's] claims for relief and the record in this case and conclude that although his resentencing trial was not error free, any errors and irregularities, even when considered in the aggregate, do not require relief because they did not render his resentencing trial fundamentally unfair, taint the jury's verdict, or render his sentencing unreliable. Any errors were harmless beyond a reasonable doubt, individually and cumulatively. Therefore, no modification of sentence is warranted and this proposition of error is denied.

Mitchell, 235 P.3d at 665. Not only does Petitioner make no attempt to challenge this holding, but instead of presenting argument about particular claims which in the aggregate might equate to cumulative error, he raises a whole new claim regarding the introduction of guilt stage evidence into his second resentencing proceeding. Petition, p. 92. For this reason, Petitioner's cumulative error claim fails from the start. See Hoxsie v. Kerby, 108 F.3d 1239, 1245 (10th Cir. 1997) ("Cumulative-error analysis applies where there are two or more actual errors."); United States v. Rivera, 900 F.2d 1462, 1469 (10th Cir. 1990) ("The cumulative effect of two or more individually harmless errors has the potential to prejudice a defendant to the same extent as a single reversible error. The purpose of a cumulative-error analysis is to address that possibility."). But even beyond this fault, the Court additionally finds that even if Petitioner's Ground XXI were construed as reasserting the general cumulative error

claim he raised to the OCCA in his Proposition XVII, Petitioner has not shown that the OCCA's denial of the same is unreasonable. Ground XXI is denied.

### IV. Motions for Discovery and Evidentiary Hearing.

Petitioner has filed motions for discovery (Docs. 22 and 40) as well as motions for an evidentiary hearing (Docs. 23 and 39). For the following reasons, the Court finds that neither discovery nor an evidentiary hearing is warranted in this case.

In order to conduct discovery, Rule 6(a) of the Rules Governing Section 2254 Cases in the United States District Courts requires Petitioner to show good cause. In Bracy v. Gramley, 520 U.S. 899, 908-09 (1997), the Supreme Court acknowledged that "good cause" requires a pleading of specific allegations showing a petitioner's entitlement to relief if the facts are fully developed. Because Petitioner has not made this showing, and because Petitioner's discovery requests concern collateral issues which do not affect the Court's determination of the grounds raised in the Petition, the Court finds that Petitioner has failed to show that discovery should be permitted.

As the Tenth Court has acknowledged, in order to obtain a hearing on a habeas petition, "the factual allegations must be 'specific and particularized, not general or conclusory.'" Anderson v. Attorney General of Kansas, 425 F.3d 853, 858-59 (10th Cir. 2005) (citing Hatch v. Oklahoma, 58 F.3d 1447, 1471 (10th Cir. 1995)). Moreover, "[t]he purpose of an evidentiary hearing is to resolve conflicting evidence." Anderson, 425 F.3d at 860. However, if there is no conflict, or if the claim can be resolved on the record before the Court, then an evidentiary hearing is unnecessary. Id. at 859. For the most part, Petitioner's request for an evidentiary hearing is too general to establish the need for one, but to the extent Petitioner's request relates to his Ground I, the Court finds that a hearing to explore why his prior habeas counsel did not seek particular relief on his Brady claim in his first habeas action is irrelevant

and without consequence to the Court's adjudication of Petitioner's Ground I. Accordingly, Petitioner's request for an evidentiary hearing is also denied.

## V. Conclusion.

After a thorough review of the entire state court record, the pleadings filed herein, and the applicable law, the Court finds that Petitioner is not entitled to his requested relief. Accordingly, Petitioner's petition (Doc. 21), motions for discovery (Docs. 22 and 40), and motions for an evidentiary hearing (Docs. 23 and 39) are hereby **DENIED**. A judgment will enter accordingly.

IT IS SO ORDERED this 27th day of July, 2016.

STEPHEN P. FRIOT
UNITED STATES DISTRICT JUDGE

11-0429p002.wpd